UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| KIVON D. REDD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| -v- ) | Cause No. |
| ) | 3:12-CV-70-RLY-WGH |
| THE CITY OF EVANSVILLE, ) | |
| INDIANA, MICHAEL R. WARD, ) | |
| JOHN PIESZCHALSKI and BRAD ) | |
| HILL or his SUCCESSOR IN ) | |
| OFFICE AS THE CHIEF OF ) | |
| POLICE FOR THE CITY OF ) | |
| EVANSVILLE, INDIANA, ) | |
| ) | |
| Defendants. ) | |

The deposition upon oral examination of MICHAEL WARD, a witness produced and sworn before me, Elizabeth A. Taylor, RPR, a Notary Public in and for the County of Vanderburgh, State of Indiana, taken on behalf of the Plaintiff at the offices of Rhine Ernest, LLP, One Main Street, Suite 600, Evansville, Indiana, on December 2, 2013, at 1:08 p.m., pursuant to the Federal Rules of Civil Procedure.

STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
20 N.W. Fourth Street, Suite 511
Evansville, IN  47708
(812) 477-4449

## Page 17

1  to your cars. Time to leave. Get off the lot.
2  Just repeat those same commands over and over.
3  Q. I don't know if I should admit this, but there's
4  been times when I've been at a bar when it closes
5  down, and it seems to me it's not that uncommon
6  that it takes a while for everybody to get out of
7  the parking lot. What would you say would be a
8  normal time frame for 100 people or so to get out
9  of a parking lot?
10 A. 15 minutes. 20 minutes.
11 Q. Even in the normal course of things, it would take
12 15, 20 minutes?
13 A. Yeah, I mean, if there was no rush. There's
14 typically some socializing that goes on while
15 people walk to their cars, wait for a cab, those
16 type of things.
17 Q. And there's nothing wrong with that kind of
18 activity; correct?
19 A. Correct.
20 Q. Provided you could identify the combatants in a
21 particular situation -- and I'm not talking about a
22 situation where weapons are involved -- would you
23 typically go address that fight first, whether it
24 was between one -- if it's between two or three
25 individuals, would you address that first?

## Page 18

1     MR. SCHMITT: Objection.
2  A. It would be considered -- I mean, we would take the
3  size of the crowd and other threats that we had to
4  contend with, but I mean, that's where we would
5  focus our attention.
6  Q. Correct me if I'm wrong, but it seems to me that if
7  the wrongdoers are the combatants and there's a
8  crowd around, unless the crowd is doing something
9  wrong itself, your main objective would be to deal
10 with the criminal activity of the fight?
11 A. That would be the end goal.
12 Q. Now, in the Scottish Rite incident, it's my
13 understanding that you guys identified the persons
14 that were being aggressive, is that fair to say,
15 when you arrived?
16    MR. SCHMITT: Objection.
17 A. We could see individuals that were more aggressive
18 than others, yes.
19 Q. How many individuals did you see acting
20 aggressively, would you say?
21 A. Maybe less than six.
22 Q. And did you personally see anybody throwing
23 punches?
24 A. I don't recall any punches. Anything specific as
25 far as that.

## Page 19

1  Q. Did you personally see anybody shove anybody?
2  A. Yes.
3  Q. Okay. Could you identify that individual?
4  A. No. There were too many individuals to -- at the
5  point I saw the shoving, I wouldn't be able to
6  specifically.
7  Q. When you first got there to the Scottish Rite, what
8  did you see?
9  A. Lots of people.
10 Q. About how many?
11 A. In the parking lot and in the front of the
12 building, close to 200 people.
13 Q. Okay. When you say in the front of the building
14 and into the parking lot, were people continuing to
15 come from the Scottish Rite itself and into the
16 parking lot?
17 A. Yes. There were people standing in the street.
18 There were people walking both directions to the
19 building, away from the building. It was just a
20 mix of people.
21 Q. Now, of that 200 people, approximately how many
22 were in the area of concern?
23 A. I'd say close to 100.
24 Q. About half of the total crowd?
25 A. Yes.

## Page 20

1  Q. And do you remember where that one area would have
2  been?
3  A. It would have been in the north portion of the
4  parking lot almost directly in the center of the
5  lot.
6     (Plaintiff's Exhibit 1 was marked for
7  identification.)
8  Q. Mr. Ward, could you maybe with a red pen identify
9  the area that you say this specific group of
10 people -- where there was the commotion was
11 located?
12 A. Yes.
13 Q. Just put an "X" will be fine.
14 A. (Witness complied with the request.)
15 Q. Okay. I'll let you keep the red pen because I'm
16 going to ask you to mark a couple things, I think.
17 "X" would note where the combatant crowd was
18 located. Is that fair to say?
19 A. Yes.
20 Q. Now, when you say that -- I guess I said it -- that
21 crowd, was there a big circle of people, or was
22 there ripples of people? How would you describe
23 how the people were assembled there?
24 A. I would say it was a large circle of people. Just
25 -- to me, I remembered seeing two distinct groups.

Page 21

1  Almost a division. There were less people on the
2  opposite side from where I was standing but more
3  towards the -- what would be the southeast and
4  northwest, larger groups congregated.
5  Q. Northeast?
6  A. Northwest and southeast.
7  Q. Okay. And I think there's room on there to show --
8  if you could write "car," would you show where you
9  parked your car when you approached?
10 A. (Witness complied with the request.)
11 Q. And when you approached, did you guys have your
12 lights and sirens on?
13 A. No.
14 Q. Did you have either?
15 A. I know when we got to the lot, the lights wouldn't
16 have been on, but neither one was on when we
17 approached the lot.
18 Q. And is that consistent with the policies of the
19 department in that type of situation?
20 A. I don't know that there's necessarily a policy that
21 states when lights should be shut off, but that's
22 my standard operation.
23 Q. Okay. You've done that many times before?
24 A. Yes.
25 Q. Nobody has ever disciplined you or chastised you

Page 22

1  for doing something like that?
2  A. No. It's part of my training in patrol tactics.
3  Q. What would be the purpose of coming in without the
4  lights and sirens on?
5  A. Well, there's several reasons. One of the main
6  reasons is so that we aren't exposed and we're at a
7  position of advantage before we're able to make the
8  determination of what actually is occurring.
9  Q. In hindsight, if you knew what you later
10 discovered, would it have potentially been
11 effective to have the lights and sirens on to
12 disperse the crowd?
13 A. As far as in hindsight knowing what I knew
14 throughout the incident?
15 Q. Yes.
16 A. Possibly.
17 Q. Is that a tactic that you use from time to time is
18 to use the lights and sirens to disperse a crowd?
19 A. Just a crowd, yes.
20 Q. And was your car equipped with a PA system?
21 A. Yes, it was.
22 Q. Is that something you sometimes use to disperse a
23 crowd?
24 A. Yes.
25 Q. And on that particular night, you had an Officer

Page 23

1  Pieszchalski that was your partner; is that
2  correct?
3  A. Yes.
4  Q. He was just a temporary partner?
5  A. We were working an overtime detail together. We
6  don't typically ride together, but we just were
7  paired up.
8  Q. That's what I meant. Is the slang the bar car, is
9  that --
10 A. Yes, that's what it's sometimes referred to.
11 Q. What is the typical duties of the bar car?
12 A. Patrol areas that -- you know, where crowds gather.
13 Bars, nightclubs are typically where we have a high
14 number of intoxicated people or people that are
15 involved in fights.
16 Q. And is there any expectation if you're called out
17 on a run that you are 99 percent or some high level
18 of the time supposed to make an arrest?
19 A. If there's a felony involved, we don't have
20 discretion, but other than that, if it's a
21 misdemeanor or an infraction, city ordinance, we
22 have discretion. The other misdemeanors where we
23 don't have the discretion would be maybe domestic
24 violence, but typically, for most misdemeanors, we
25 have the discretion.

Page 24

1  Q. What about a battery? Would you have a discretion
2  in that scenario?
3  A. No.
4  Q. Disorderly conduct would be one that would fit in
5  the discretion area category?
6  A. Yes.
7  Q. Could you explain to me what information you had
8  before you arrived at the Scottish Rite?
9  A. I was given information over the radio that there
10 was a fight, and they had requested for any car to
11 respond.
12 Q. It's my understanding that you just happened to be
13 the closest car; is that right?
14 A. Yes. We were in the area.
15 Q. Were there other patrol cars in the area as well?
16 A. I'm not sure.
17 Q. Did it take long for others to arrive after you
18 did?
19 A. Within minutes. So I mean, I would assume they
20 weren't very far.
21 Q. Do you remember how many units actually ended up
22 coming that night?
23 A. As far as units, sometimes they're a two-man car.
24 I can recall seeing maybe six, seven other officers
25 that night.

1 Q. At most?
2 A. It could have been nine at most, but I can remember
3 maybe half a dozen off the top of my head.
4 Q. Did you and Officer Pieszchalski discuss how you
5 were going to handle the situation before you got
6 there?
7 A. We didn't really have any conversations regarding
8 that.
9 Q. Okay. Had you worked with Officer Pieszchalski
10 before in a bar car situation?
11 A. Not that I recall.
12 Q. Was it typical for any individual to have a bar car
13 assignment? I mean, is it something you did a lot
14 or Pieszchalski did a lot or did somebody normally
15 take that role?
16 A. They tried to distribute it fairly. I mean, there
17 was a sign-up sheet, and you would sign up. I
18 think at the time the lieutenant took care of --
19 maybe if you'd done it four times, another guy
20 asked to do it and he'd done it twice, he's
21 probably going to get it, but I think they tried to
22 evenly distribute the -- since it was overtime.
23 Q. About how often prior to this incident had you been
24 in the bar car?
25 A. I wouldn't be able to put a specific number, but I

Page 26

1 mean, numerous times.
2 Q. And you described events at the Icon on the east
3 side sector. Would you characterize what you did
4 in the bar car similar to what you typically did on
5 a weekend night at an east side or Icon location?
6 A. If we were in the bar car, typically we would
7 patrol the areas that crowds were known to gather.
8 Problem bars. You know, Hammerheads was one that
9 sticks out in my mind at the time. That's probably
10 why we were close to this area. We were probably
11 checking out Hammerheads. But typically we would
12 just drive through the areas looking for, you know,
13 groups of people standing outside, any kind of
14 signs of fights getting ready to start, those type
15 of things. Just -- and, you know, other crimes as
16 well. We weren't limited to fights and crowds
17 only, but if we came upon anything that needed
18 police action, we would take it as well.
19 Q. But that was the routine occurrence of the bar car?
20 A. Yeah. That's the main responsibility. We weren't
21 responsible for responding to routine report runs
22 throughout the city or anything like that. Our
23 main focus was to patrol the crowds and bars,
24 problem areas.
25 Q. When you and Officer Pieszchalski arrived at the

Page 27

1 Scottish Rite, was there any discussion at that
2 point who was going to do what?
3 A. Not specifically, no.
4 Q. To the extent you can remember what communication
5 occurred between you and Officer Pieszchalski
6 between the time you got there and the time Kivon
7 Redd was arrested, could you explain that to me?
8 A. The only thing I can remember at this point is just
9 discussing on getting more cars to assist us, more
10 officers on scene. I think I might have instructed
11 him to call for more cars, and I might have
12 verified later whether or not he did that. But the
13 communication would have been limited to something
14 along those lines.
15 Q. Was he -- strike that. Did you communicate to him
16 in any way that you were getting the OC canister?
17 A. I don't remember if I said that specifically or
18 not.
19 Q. Had you had any communication with him prior to
20 that that you did have, in fact, an OC canister?
21 A. I don't recall that specifically.
22 Q. What was your first thought when you arrived at the
23 scene as to what you needed to do?
24 A. My first concern was we had a large group, and we
25 were outnumbered. My main focus at that time was

Page 28

1 to get more officers there.
2 Q. Did you have any emergent need to enter the crowd
3 before other officers arrived?
4 A. As far as to -- I wanted to get close to that
5 group, but as far as getting into the center of it,
6 no.
7 Q. I mean something a little different than that.
8 You're talking about the center of the crowd and
9 I'm just talking in terms of the parking lot
10 itself, getting into the middle of the mix there.
11 A. Yes.
12 Q. Is that something that you thought there was an
13 emergency for you to do that?
14 A. Yes. I needed to -- from the position I was at, my
15 car, I could not see clearly what was going on in
16 the center of that group, and I needed to determine
17 if someone was being injured, you know. I had ten
18 things going through my mind that could be
19 occurring, and I had to find out if any of those
20 things were happening to anyone.
21 Q. What is it that you thought was most likely
22 occurring?
23 A. It appeared to be a fight from that distance to me.
24 Q. Could you -- I think you said before you could
25 identify certain numbers that seemed to be more

1 aggressive than others. You felt you could
2 identify who the people were that were wanting to
3 fight?
4 A. At this point, no.
5 Q. At that point when you were there?
6 A. Yes. I mean, if it was -- if I was to look at
7 those individuals while I was there, I would have
8 been able to identify them.
9 Q. That's what I mean. And I'm not meaning me to hand
10 you a picture today and say, hey, was this the guy.
11 But in terms of when you were there that night, did
12 you have a good sense of who were the combatants in
13 that situation?
14 A. Yes.
15 Q. And you think there was approximately how many?
16 A. In the tight group itself?
17 Q. What we would call the combatants.
18 A. I saw -- when I said "six," I'm referring to the --
19 there's a couple of aggressors that were being held
20 back by the crowd, and the individuals that were
21 holding back the main aggressors were also shouting
22 at the other group and inciting things to continue.
23 So they're the ones I include in that six number.
24 Q. Okay. That makes more sense to me. So there was
25 two in particular that were being held back?

1 A. Yes.
2 Q. And did those people have their shirts off, those
3 two individuals?
4 A. I only recall one.
5 Q. And before deploying the pepper spray, was there
6 only one person you saw with their shirt off?
7 A. That I remember focusing on, yes.
8 Q. And is that typically an indication that's one of
9 the people that's wanting to fight or talking about
10 fighting by taking their shirt off?
11 A. That's typically what occurs. I don't know where
12 that came from. It usually makes it easy for us to
13 spot who's intending on fighting because that's --
14 I don't know if it's to save the shirt from being
15 damaged but, you know, that's an action we
16 typically see is when the shirts are removed, we
17 know a fight is imminent.
18 Q. Now, could you identify today who that person was
19 that had their shirt off?
20 A. Yes.
21 Q. Who was that?
22 A. Alordo Bell.
23 Q. At any time did you see the two that were being
24 held back let go or go towards each other?
25 A. Yes.

1 Q. Okay. And about how long after you had been on the
2 scene did that happen?
3 A. Within the first two minutes.
4 Q. Now, when you first arrived and saw this crowd that
5 included the two being separated or pulled apart,
6 what was your priority at that point?
7 A. Just to ensure the safety of everyone including
8 ourselves.
9 Q. Did that primary goal change at any time?
10 A. I think that was primary at all times.
11 Q. The activity that you saw going on in that group,
12 did you see anything that you considered to be a
13 violation of the law, whether it be a misdemeanor,
14 infraction or anything else?
15    MR. SCHMITT: Which group are you talking
16 about?
17    MR. MACER: What I'll call the inner group.
18 Is that fair?
19    MR. SCHMITT: Can we call it like a fight
20 ball?
21    MR. MACER: No.
22    MR. SCHMITT: No?
23 Q. You know what I'm talking about when I say the
24 inner crowd?
25 A. I guess if you refer to it as the crowd in the

1 parking lot.
2 Q. Where you marked the "X."
3 A. Yeah.
4 Q. Where you marked the "X." Okay. That's what I'm
5 talking about when I say the inner crowd. Okay?
6 A. Uh-huh.
7 Q. When you saw the inner crowd go together and the
8 two start to engage -- is that a fair way of
9 putting it?
10 A. Yes.
11 Q. What did you do then?
12 A. That's when I determined it was necessary to deploy
13 the pepper spray.
14 Q. And when you -- when you decided to then deploy the
15 pepper spray, was it aimed at those individuals in
16 that inner crowd?
17 A. At the -- yes, the entire area of the "X."
18 Q. You weren't trying to shoot the two specific people
19 you had identified?
20 A. I did not focus on anyone individually.
21 Q. Okay. I need to back up and ask you some general
22 questions because I don't really understand very
23 well the OC stuff. Okay?
24 A. Okay.
25 Q. I've seen it described as similar to a fire

Page 33

1  extinguisher; is that accurate?
2  A. That's correct.
3  Q. And would it be about the size of a fire
4  extinguisher?
5  A. A small fire extinguisher, yes.
6  Q. And what was the particular model that you have?
7  A. I believe it's a Mark 46, but I'm not 100 percent
8  sure on that. It would be signified MK-46 but the
9  number is what I'm uncertain on.
10 Q. And does that piece of equipment have more than one
11 way to deploy pepper spray?
12 A. No.
13 Q. Does it spray it in a stream?
14 A. No. It's a fog.
15 Q. A fog pattern. So if you were trying to hit Alordo
16 Bell and the other person directly, it would be
17 hard to do?
18 A. Correct.
19 Q. You identified Alordo Bell. Do you know who the
20 second individual was that was being held back?
21 A. No, I do not.
22 Q. And you never found that out?
23 A. Correct.
24 Q. Did that person leave the scene, that second
25 person?

Page 34

1  A. I don't know.
2  Q. Wasn't somebody you ever had any direct dealings
3  with?
4  A. Right. I didn't recognize them or wasn't able to
5  identify who they were later.
6  Q. When you deployed the pepper spray, what was your
7  purpose?
8  A. To disperse the crowd.
9  Q. Did you consider going to apprehend the two
10 specific individuals at that time?
11 A. It crossed my mind, but as with any other
12 decision-making process we do, it wasn't feasible
13 at the time.
14 Q. Why wasn't it feasible?
15 A. Because of the danger it would have put myself and
16 Officer Pieszchalski in.
17 Q. Did you recognize that when you deployed the fog,
18 the pepper spray, that you were going to hit
19 innocent persons?
20    MR. SCHMITT: Objection.
21 A. When you say "innocent," that's -- I'm confused by
22 that.
23 Q. Fair enough. When I say "innocent," I mean
24 somebody that was not breaking the law in any way
25 at that time.

Page 35

1  A. In my opinion, there were numerous people breaking
2  the law that night. That group had been ordered
3  numerous times to leave, which constituted
4  trespass. So, you know, while there may be some
5  people downwind from the spray that were affected,
6  those in that group were committing a misdemeanor.
7  Q. At what point did their actions become a
8  misdemeanor?
9  A. When they're on property that they have no
10 contractual interest in and are told to leave and
11 refuse to do so.
12 Q. Now, you understand there's some time component
13 required from you issuing a verbal command to when
14 a person can reasonably do what you've ordered them
15 to do. Would you agree?
16 A. Yes.
17 Q. What would be a reasonable time component to expect
18 after you've verbally signified to leave the area
19 for the crowd to disperse?
20 A. 15 seconds. Do you mean fully disperse or to begin
21 the process? I'm referring to beginning the
22 process of leaving in 15 seconds.
23 Q. So you think by your verbal command action becomes
24 a criminal act within 15 seconds of you issuing
25 that command?

Page 36

1     MR. SCHMITT: Objection.
2  Q. To the extent that the people there do not follow
3  your command immediately.
4     MR. SCHMITT: Objection.
5  A. Not in every case, but at that point, yes.
6  Q. If everybody was trying to do what you wanted them
7  to do, how long do you think it would take for the
8  crowd to disperse?
9  A. And be totally out of the lot?
10 Q. Yes.
11 A. Ten minutes.
12 Q. So if everybody did exactly what you told them to
13 do, it would take ten minutes for them to have
14 gotten out?
15 A. To exit the property, yes.
16 Q. The quickest?
17 A. I would think so.
18 Q. You think 200 people could get in their cars and
19 get out of a parking lot within ten minutes?
20 A. I think so.
21 Q. Approximately how many cars do you think were in
22 the parking lot?
23 A. Maybe 60. 50 to 60.
24 Q. And as a percentage of the parking lot itself,
25 about how much would you say was filled with

1  Q.  Is that all you ever deployed towards that area?
2  A.  Yes.
3  Q.  And about how long of a spray or burst if you'd
4  call it?
5  A.  If I had to guess, I would say one second.
6  Q.  Okay. Again, I have no knowledge or understanding
7  of OC spray. Never seen it operated. So with that
8  in mind that I'm a dummy to this, try to explain to
9  me how that kind of burst -- what kind of area that
10 would have covered.
11 A.  According to my training when you're dealing with
12 crowds -- and that's the reason the canister uses a
13 fog pattern as opposed to the straight stream like
14 what officers carry on their belt typically. It's
15 most effective if you go over the top of the crowd,
16 and then it basically just is allowed to rain down
17 on them. When I say "rain down," it's not a
18 completely liquid form. It is more of a fog, a
19 mist, but that's -- it's more effective that way,
20 and you're not individually targeting a person. So
21 the basic application would be to arc it over the
22 crowd just in a quick spray, and that's what was
23 done in this case.
24 Q.  Did you issue any warnings that you were about to
25 spray the crowd before you did?

Page 42

1  A.  Not specifically a warning about spray, no.
2  Q.  Is that something you sometimes do?
3  A.  Yes.
4  Q.  Why didn't you do it in this circumstance?
5  A.  There was no time.
6  Q.  Why was there no time -- or how was there no time?
7  A.  Typically in these circumstances we'll give the
8  commands to leave. When the crowd doesn't follow
9  those commands, we will notify them that, you know,
10 either they're going to be arrested, if there's no
11 canister. If we're going to use a canister, a lot
12 of times we'll notify them of that. Alordo Bell's
13 actions forced me to take action, and I wasn't able
14 to let them know that the spray was about to be
15 deployed.
16 Q.  What did Alordo do specifically?
17 A.  He broke free of the individuals that were
18 attempting to control him and charged at the other
19 individual.
20 Q.  Prior to you deploying the pepper spray, was the
21 crowd antagonistic or in any way threatening toward
22 you or Officer Pieszchalski?
23 A.  I don't remember anything specific. The crowd's
24 focus was on Alordo Bell and the other individual
25 and the people at the center of that circle.

Page 43

1      MR. SCHMITT: And, again, are you talking
2  about the inner crowd, or are you talking about --
3  Q.  I'm talking about the inner crowd unless I tell you
4  different. In terms of how many people you think
5  you hit with the fog, could you give any reasonable
6  estimate?
7  A.  Not accurately. In that circle, 40 people, maybe.
8  Q.  Are there times where you deploy pepper spray in a
9  different manner other than above the crowd, for
10 instance, shooting it at their feet to give them a
11 warning or anything like that?
12 A.  Not shooting at the feet. There have been
13 occasions where the spray wasn't -- was focused on
14 an individual similar to what a straight stream
15 would be but that was just because that was the
16 immediate tool available.
17 Q.  Give me a sense of how far the fog sprays.
18 A.  Somewhere in the area of ten feet.
19 Q.  That'd be max?
20 A.  Yes.
21 Q.  So you were within ten feet of this inner crowd to
22 be able to hit them?
23 A.  Yes.
24 Q.  When did you first realize that you had hit Officer
25 Pieszchalski with the OC spray?

Page 44

1  A.  After the event was over, we discussed it, and he
2  said he was affected by the spray, and I explained
3  to him that I was also.
4  Q.  Was he upset about that?
5  A.  No.
6  Q.  Is that something common that your partner gets hit
7  with the spray as you deploy it?
8  A.  It's common that everyone feels the effects of the
9  spray regardless if it's a canister or the small --
10 the small can on a belt. If the spray is deployed,
11 I mean, it seems that anyone in the area is going
12 to be affected by it.
13 Q.  Under what circumstances pursuant to the practices
14 of the department are you supposed to use OC spray?
15 A.  It's equivalent to utilizing a Taser. It's a less
16 lethal option to gain compliance.
17 Q.  And it's meant to be pain compliance; is that
18 correct?
19 A.  Correct.
20 Q.  And also has the effect of causing fear and anxiety
21 in the people that are hit?
22 A.  General discomfort is the way I would put it
23 because I -- you know, of course, we have -- anyone
24 who carries it has been exposed to it. We feel the
25 effects of it, that way we know the limitations.

## Page 45

1 Q. Can cause gripping pain in certain individuals. Is
2 that fair to say?
3 A. Pain is very objective. I suppose that would be
4 possible.
5 Q. In any of your training, have you ever seen it
6 described as gripping pain?
7 A. No.
8 Q. Have you ever had any training on the OC canister?
9 A. Yes.
10 Q. When?
11 A. During the -- my time at the academy, the Southwest
12 Indiana Law Enforcement Academy.
13 Q. Between the time you exited the academy and the
14 time of this incident at the Scottish Rite, had you
15 had any other training on OC canisters?
16 A. Yes. There were updates given. I can't recall
17 specifics on those but -- during the in-services
18 and those types of things, we typically have those
19 updates.
20 Q. In my review of the CALEA reports -- are you
21 familiar with CALEA?
22 A. Yes.
23 Q. It was indicated in the report that in the two
24 years prior to 2010 there hadn't been OC training
25 performed. Were they wrong? Had you had some

## Page 46

1 training in that time frame?
2 A. I can't recall specifically in 2008.
3 Q. Would it be within your training -- or strike that.
4 Would it be within your personnel file to show
5 whatever training you've had on OC canister?
6 A. Should be, yes.
7 Q. If you wanted to go to the department and say, hey,
8 when's the last time I had training in OC canister,
9 who would you talk to?
10 A. Personnel in training. The personnel in the
11 training department. Probably Debbie Baird.
12 Q. Can you remember any of the in-service training
13 you've had as to OC canisters, who performed it,
14 where it was, when it was?
15 A. Typically at the time it was Sergeant Pugh, who is
16 now assistant chief. He was the less lethal
17 coordinator at the time, and he was typically the
18 one that handled those type of items. He was also
19 responsible for our initial training at the
20 academy.
21 Q. Would you describe for me in a general sense what
22 that training is?
23 A. It focuses on, again, the limitations of the pepper
24 spray, focuses on what it can cause, certain
25 conditions it can aggravate in individuals, things

## Page 47

1 to be aware of, medical problems that may develop
2 as a result of those physical conditions being
3 aggravated. Proper deployment, effective
4 deployment, you know, occurrences in which to use
5 it. Those are -- I mean, that's -- just off the
6 top of my head, those are the things that I can
7 recall.
8 Q. And what are the typical instances that they teach
9 you that you should use the pepper spray?
10 A. It's mainly designed for use in a situation where
11 you're trying to effect an arrest and you get that
12 discomfort. A lot of times it can be just a
13 distraction technique. Because of the discomfort
14 that it causes, it can be distracting enough for
15 you to gain the advantage enough to handcuff
16 someone.
17    In these crowd control instances, it -- I've
18 noticed that people who aren't directly involved or
19 aren't directly the aggressors tend to -- if they
20 feel the slightest amount of effect from it, will
21 disperse if they're ignoring our commands
22 otherwise, but, you know, those are typically the
23 cases in which we use it. It's considered an
24 intermediate type of a less than lethal weapon.
25 Q. Would you agree that that level of force, using the

## Page 48

1 OC canister, shouldn't be used if you could
2 accomplish your goal with a less forceful means?
3    MR. SCHMITT: Objection.
4 A. If there's an option available, yes.
5 Q. What other options are there generally?
6 A. Hands on control and verbal compliance.
7 Q. Anything else?
8 A. Typically, we -- you know, we will give verbal
9 orders. If those aren't effective, we will go
10 hands on, and if -- I mean, that's eventually going
11 to become effective but that's --
12 Q. Isn't there varying degrees of the verbal, though?
13 That is to say you could say "leave." Yell it
14 louder. You can make it more specific to specific
15 individuals. You can say more specific threats of
16 you're going to be arrested if you don't leave.
17 You're going to be sprayed with pepper spray if you
18 don't leave, those sorts of things.
19 A. Yes, I would say there are degrees.
20 Q. Okay. And would you agree that in most
21 circumstances in these crowd situations you've
22 talked about that you do not have to deploy the OC
23 canister?
24    MR. SCHMITT: Objection.
25 A. There have been a number of crowds that we did not

## Page 49

1 have to do anything other than our presence to
2 control a crowd.
3 Q. I think also we mentioned earlier sometimes lights
4 and sirens can be effective at dispersing a crowd
5 as well?
6 A. That is a potential tool to use, yes.
7 Q. As well as being in the car and using the PA
8 system?
9 A. Yes.
10 Q. Are you aware of any way in which you could
11 effectuate a warning shot, so to speak, of OC
12 spray?
13 A. Typically, we don't do anything that's a warning
14 shot, whether it be from our pistol or anything
15 else because there may be unintended effects of
16 that, and warning shots aren't something we
17 typically employ.
18 Q. Did you take into account what I'll call collateral
19 damage, meaning the innocent bystanders that would
20 be hit with you using the pepper spray before you
21 deployed it that day?
22    MR. SCHMITT: Objection.
23 A. That was a consideration.
24 Q. And what did you consider?
25 A. It's -- we commonly know that when we deploy it, we

## Page 50

1 will be affected, which I would consider myself an
2 innocent bystander as far as the circumstances go
3 here. We know that ahead of time, and it's -- we
4 have to weigh our options, and at this point, when
5 I saw the crowd begin to converge, the risk of me
6 not doing anything or continuing to do the same
7 thing was not having an effect; therefore,
8 something needed to change to control this crowd
9 before things got worse.
10 Q. What did you foresee happening if you didn't step
11 in?
12 A. Well, I've been involved in many of these crowd
13 control instances, of course, and typically, what I
14 see is if the crowd does not recognize our
15 authority to have them disperse, things will
16 typically get worse. An individual will usually
17 project themselves as, you know, the center of
18 attention, which, you know, usually results in a
19 confrontation between those individuals and turns
20 into a fight. Once the fight does happen, if we
21 allow that to go, it makes it more difficult for us
22 to get in and gain control once we've lost control.
23 Q. You didn't suspect any weapons at that point before
24 you deployed the pepper spray; is that correct?
25 A. I did not see any weapons.

## Page 51

1 Q. Didn't have any indication to think anybody was
2 under the influence of drugs or alcohol at that
3 time?
4    MR. SCHMITT: Objection.
5 A. I didn't have the time to test anyone, but the
6 behavior I was seeing was consistent with people
7 who were under the influence of those type of
8 things.
9 Q. Explain to me the behavior that you were seeing.
10 A. The outward aggression. Those are all consistent
11 with people who are intoxicated or on substances.
12 That's one of the markers we see when -- when
13 someone is intoxicated, they tend to have the -- a
14 more aggressive attitude. So it was something that
15 I wasn't -- I did not rule out at that point.
16 Q. Do you know what the SOP is on use of force?
17 A. I've reviewed the SOP.
18 Q. What does it say?
19 A. I can't quote it verbatim. It just basically
20 specifies -- not necessarily when we can use force
21 but examples of situations that would indicate the
22 use of force to effect an arrest. That's basically
23 what it focuses on.
24 Q. Can you give me what examples they give?
25 A. No, I can't. I don't know if they're specific

## Page 52

1 examples, but it gives you areas where -- you know,
2 specifying to effect an arrest if force is needed,
3 use only the reasonable amount of force required to
4 do so.
5 Q. Would it be fair to say the minimum amount of force
6 needed?
7 A. I don't -- I don't recall if "minimum" is in there
8 or not.
9 Q. If you can't articulate the standard, how can you
10 abide by the standard when you're in the field?
11    MR. SCHMITT: Objection.
12 A. The standard is a guideline, and it -- it's
13 something that we -- we operate under it.
14 Obviously, cannot cover every circumstance in a
15 police officer's job functions, every task that's
16 required. That's why it says to use reasonable
17 amount of force. I believe the word is
18 "reasonable," not "minimum." Because there are --
19 there are times where the minimum would not be
20 effective. So -- but my understanding of the
21 policy is that that's -- that's what gives us the
22 authorization to use the reasonable amount of force
23 to effect an arrest or if there's a safety concern
24 such as in this one.
25 Q. Would it be fair to say then that the use of force

1  A.  Maybe on occasion. I don't remember anything
2  specifically.
3  Q.  What makes speech illegal, in your opinion?
4  A.  When it's to the point that it disrupts other
5  people as far as, you know, whether it's the
6  volume. When it enters the realm of disorderly
7  conduct. Loud, loud behavior that --
8  Q.  Can you tell me what the elements of disorderly
9  conduct are?
10  A.  Engaging in fighting, tumultuous conduct, you know,
11  disruptive behavior to the point of gathering the
12  attention of other people. I wouldn't be able to
13  quote it exactly but that's my understanding of
14  disorderly conduct.
15  Q.  And you're aware that Judge Kiely specifically
16  ruled that the speech of Kivon Redd on that day was
17  protected free speech?
18     MR. SCHMITT: Objection.
19  A.  That was my understanding of what the judge said.
20  Q.  He's the judge. He's in charge of deciding what's
21  constitutional or not, isn't he?
22  A.  That's correct.
23  Q.  Your use of force was evaluated and you were
24  exonerated for your actions that day; is that
25  correct?

1  A.  Correct.
2  Q.  Do you know by what standards they viewed your
3  conduct?
4  A.  As far as our code of conduct?
5  Q.  Yes.
6  A.  Usually what's -- what happens with the use of
7  force is it's reviewed to those standards, what
8  you're referring to earlier, the rules and
9  regulations, and they compare them -- they compare
10  our actions to those standards. If it's excessive
11  force, if it's neglect of duty, and when that
12  complaint is sent through, each one of those items
13  is evaluated, and if it falls under excessive
14  force, they review that excessive force standard
15  and then say whether or not you were justified.
16     I think there's three options. One was -- it
17  was sustained if you did in fact -- if the
18  complaint was sustained, and then there's
19  exonerated, and then -- I can't think of the term
20  for the third one, but you did what was stated in
21  the complaint but you were justified in doing so.
22  Q.  Are you aware of any situation since you've been on
23  the force where another officer has been
24  disciplined for excessive force?
25  A.  Yes.

1  Q.  Okay. In what situation did that occur?
2  A.  I don't recall anything specifically, but I know of
3  circumstances where it's happened.
4  Q.  Do you know who?
5  A.  Not off the top of my head.
6  Q.  I mean, you just vaguely remember that, or do you
7  have a specific incident in mind you think it did
8  occur?
9  A.  I can remember situations. I don't remember
10  officers specifically, but I can remember -- there
11  has been those cases.
12  Q.  None in which you were involved?
13  A.  Correct.
14  Q.  And I don't mean you personally, but I mean -- not
15  you personally committing the violation but were
16  present when the violation occurred?
17  A.  Correct.
18  Q.  How would you define "reasonable force"?
19  A.  The force that's necessary to effect the arrest.
20  Q.  In this case there wasn't an arrest, though.
21     MR. SCHMITT: Objection. There was.
22  Q.  Let me rephrase. There wasn't an arrest that you
23  were trying to effectuate at the time you deployed
24  the pepper spray; is that correct?
25  A.  We would have made numerous arrests out of that

1  crowd. When I -- that's part of the reason I had
2  confusion with the innocence when you used that.
3  If I would have had 50 officers there with a
4  transport wagon, I could have filled that wagon
5  with plenty of people. Like I said, I had given
6  them commands to leave. There were people that
7  were trespassing. There were people that were
8  acting in a disorderly manner. So I could have
9  made many arrests. I didn't have the manpower
10  necessary to do that safely for myself and Officer
11  Pieszchalski at the time. I could have made an
12  arrest on numerous individuals in that circle
13  before the pepper spray was ever deployed.
14  Q.  Have you ever been given any specific training as
15  to crowd control?
16  A.  When you say "specific," you're not talking about,
17  like, an hour long block of just strictly crowd
18  control? Is that what you're referring to or --
19  Q.  I really don't know. I mean, I'm not trying to
20  specify it as a time block, whether it be
21  15 minutes or an hour or a day. I mean, just any
22  specific crowd control training that --
23  A.  Yes.
24  Q.  -- you can remember having?
25  A.  Yes. We've been in the academy and then since

Page 69

1 after with OC refresher. You know, that's
2 typically -- you're going to use more OC in those
3 situations generally. So that's when they discuss
4 crowd control tactics.
5 Q. And is there a normal, if there is such a thing,
6 situation where you would use OC to control a
7 crowd?
8 A. I would call normal the instances that I've used it
9 in the past and documented it.
10 Q. And nobody has ever found your use of force to be
11 unreasonable at any time?
12 A. That's correct.
13 Q. You've never been cited for any unreasonable
14 force --
15 A. Never.
16 Q. -- while you've been working for the Evansville
17 Police Department?
18 A. That's correct.
19 Q. And you've used pepper spray on several occasions,
20 and it's been reviewed?
21 A. Yes.
22 Q. I think by your answers, in terms of what was a
23 greater priority for you between dispersing the
24 crowd and apprehending the combatants, your actions
25 signify to me that the greater priority to you was

Page 70

1 dispersing the crowd. Would you agree with that?
2 A. That's correct.
3 Q. The fact that the crowd was basically teenagers as
4 opposed to being at a bar or outside a bar with
5 intoxicated adults, do you view that situation any
6 different or should be handled in any different
7 fashion?
8 A. I don't remember having the consideration of them
9 being teenagers. To be quite honest with you, when
10 I walked into that crowd, it seemed like the
11 typical age group of crowds we deal with at bars.
12 I didn't make the distinction as far as it being
13 teenagers or anything of that nature.
14 Q. You do recognize that after you made these verbal
15 commands to leave, that there is a certain amount
16 of time that would be necessary for people to wait
17 on the people they're riding with or the people
18 that are driving them or to make communications of
19 who is going where, that sort of thing?
20 A. I understand that, and my expectation was to see
21 people moving towards that direction, and I did not
22 get that compliance. There were no vehicles where
23 the group was. And by compliance, all I was asking
24 was for people to walk that direction, and none of
25 that was being done. There was no effort made on

Page 71

1 the majority of that crowd to make any movement
2 towards a vehicle, towards the business, towards
3 the sidewalk, anything.
4 Q. Have you ever talked to Kivon Redd after the
5 Scottish Rite incident?
6 A. Not that I recall.
7 Q. Have you ever talked to any of the other people
8 that were charged or any of the witnesses after
9 that event?
10 A. I may have had a dealing with Alordo Bell at some
11 point but -- I think I saw Michael Fleming in a
12 restaurant one time. I don't think we spoke at
13 all.
14 Q. Would you know who Kivon was if you saw him out and
15 about?
16 A. Possibly.
17 Q. Seeings how not everybody has OC canisters issued
18 to them, would you agree that you should be able to
19 effectuate your job properly without OC canisters?
20 A. When you say "properly," just like with any tool,
21 whether it be the Taser, before it was introduced,
22 arrests were made. And just like in this case, if
23 we did not have those tools available, it would
24 have put us in greater danger. It would have --
25 part of the advantage of these type of tools,

Page 72

1 pepper spray, Tasers is that we don't have to go
2 hands on. When we go hands on, generally people
3 are injured as a result of falling to the ground,
4 whether strikes have to be thrown. In regards to
5 these instances, even the Taser -- you know, the
6 Taser leaves two small holes, two punctures. Other
7 than that, there's no residual effects, typically.
8    Same thing with the pepper spray. Once the
9 effects pass, there are no other injuries. Yes, I
10 think we could have probably made -- made the
11 arrests that we made without those tools, but it
12 definitely made it safer for us, cleared out the
13 ones that were not part of the actual combatant
14 group. So, you know, yes, I think it could have
15 been done but definitely would have been more
16 difficult for us and could have stood the chance of
17 someone else being injured as well as ourselves.
18 Q. Tell me what happened after Kivon was hit with the
19 spray and you first heard him complain. Explain
20 your interaction with him, if you could.
21 A. He was -- he was very aggressive in his posture.
22 He was clenching his fists and shouting. I
23 remember him stomping his feet a couple of times,
24 but with what he was shouting and the tone he was
25 using, it definitely became something that I wanted

Page 73

1  to focus on. It became -- I would call it
2  threatening, but there wasn't anything about
3  necessarily what exactly he was saying. It was the
4  manner he was saying it. I've seen this behavior
5  in people before who tend to -- you know, when they
6  do want to fight the police, there's usually two
7  methods to do that. They either decide they're
8  going to do it and they just start fighting with
9  us, or they kind of work themselves up into that
10 and tell themselves I know I'm right. You know,
11 they convince themselves that what they're about to
12 do is correct because we're wrong. They reinforce
13 that and get into that frenzy and then commit the
14 act, and that behavior was what I saw out of
15 Mr. Redd that night.
16 Q. So you don't think he said anything in terms of the
17 content of what he said that was illegal?
18 A. Not the content, no.
19 Q. And then once you did tell him to get on the
20 ground, what did he do?
21 A. He got on the ground and complied, I mean, after
22 numerous commands and -- actually, I had to point
23 the canister -- I told him I would spray him again,
24 I remember specifically saying that, and get on the
25 ground, and then he complied after I threatened him

Page 74

1  again.
2  Q. You didn't have to use physical force to get him to
3  the ground; is that correct?
4  A. That's correct.
5  Q. And then once he was on the ground, about how long
6  did it take you to get him handcuffed?
7  A. Maybe 10 seconds, 15 seconds.
8  Q. Okay. So he didn't -- there wasn't any substantial
9  struggle on his part?
10    MR. SCHMITT: Objection.
11 A. In my consideration, yes, there was a substantial
12 struggle. He did not simply place his hands behind
13 his back as ordered. Officer Pieszchalski and I
14 had to fight for his hands. I remember
15 specifically pulling at his right arm several times
16 as he attempted to hide it underneath himself. You
17 know, that's a typical form of resistance that we
18 see when someone does not want to be handcuffed.
19 There was enough of a resistance that I had to
20 actually sit the canister down in order to gain
21 control of his hands.
22 Q. Did you see anybody put their knee or foot in
23 Kivon's back?
24 A. Yes.
25 Q. Okay. Who did that?

Page 75

1  A. I put a knee in the small of his back.
2  Q. Okay. What was the purpose of that?
3  A. To control his body.
4  Q. About how long did you have your knee in his back?
5  A. Again, I would say somewhere in the neighborhood of
6  30 seconds. I mean, that's a very rough estimate.
7  Q. Anybody, you, Pieszchalski, anybody else have their
8  knee, foot in Redd's back after he was handcuffed?
9  A. I think I remember Officer Pieszchalski doing the
10 same thing to control him, but I wouldn't be able
11 to say how long or anything, but yes, after I
12 initially cuffed him, yes.
13 Q. Did he try to get up at all?
14 A. Yes.
15 Q. After he was cuffed?
16 A. Yes. And that was the purpose for the knee.
17 Q. In terms of the internal affairs investigation,
18 I've seen where you gave a statement in that
19 investigation; is that correct?
20 A. Yes.
21 Q. And before giving your statement, were you provided
22 the statement of the other witnesses?
23 A. I don't believe I saw the statements of the
24 witnesses. I did see a copy of the complaint.
25 Q. Anything else that the IA provided you before you

Page 76

1  had -- before you provided your statement?
2  A. The only thing I recall is just the initial
3  complaint itself, what was stated by the
4  complainant.
5  Q. I want to ask you about other incidents in which
6  you've used pepper spray.
7  A. Okay.
8  Q. Documents were provided to me. It seems like, for
9  instance, in the year 2009 it looks like you used
10 pepper spray seven or eight times. Does that sound
11 about right?
12 A. Yes, that sounds correct.
13 Q. For instance, on a date reported 8-18 of 2012 in
14 the incident investigation report narrative I see
15 it stated, "At the time, several males in the crowd
16 began to surround us and protest the defendant
17 being taken in custody. I deployed the pepper
18 spray canister toward the group to keep them away."
19 Do you remember that incident?
20 A. Where was it at again?
21 Q. 317 Main. I assume that would be Hammerheads.
22 A. What was the date on that? Was it around
23 Christmas?
24 Q. 8-18-2012.
25 A. I don't remember that specifically.

1 spray or pepper balls. You had mentioned that
2 there was some numerous tactical reasons why you
3 would not show up with lights and the siren in this
4 sort of situation, and I wondered if you could
5 elaborate on that a bit.
6 A. Most of the time our concern when we're told
7 there's a fight is obviously the potential for
8 someone being injured, and obviously, if there are
9 injuries, there's going to be a suspect. And in
10 this case, when I was told there was a fight, saw
11 what looked to be a fight, I wanted to be able to
12 see who my suspect could potentially be before --
13 before I scared off the crowd.
14 Q. So you're attempting to preserve the suspect and
15 not have essentially your evidence leave the scene
16 before you can get there. Would that be fair to
17 say?
18 A. Correct.
19 Q. You were questioned by plaintiff's counsel that --
20 did you have any knowledge to suggest that Mr. Redd
21 was not leaving, and you rightly stated you can't
22 know what his intent was, so no, but you also said
23 that there were no cars in the north end of the
24 lot. The inner crowd, we called it, was on the
25 north end of the lot. The spray itself can only go

1 about ten feet. Is it safe to say that regardless
2 of what was in his head, he was near the crowd, the
3 fighting crowd, and he was not near the cars?
4 A. Yes.
5 Q. Once the verbal sparring started happening with
6 Mr. Redd, he was -- he had moved farther south into
7 the lot. He was behind you. Would it be fair to
8 say that you were at that point in between Mr. Redd
9 and the crowd that had been in the fighting
10 altercation?
11 A. Yes. I was between what was left of that crowd and
12 Mr. Redd.
13 Q. So when Mr. Redd continued to speak and a smaller
14 crowd started forming with him, you were stuck in
15 between two crowds?
16 A. Yes.
17 Q. So that -- did that contribute to your feeling of
18 your own safety? You didn't want to be caught in
19 between --
20 A. I didn't know the intent of Mr. Redd at that point
21 or anyone else in that crowd, for that matter, and
22 that caused me to have to divide my attention
23 between the two threats, you know, until proven
24 otherwise.
25 Q. Okay. The only other thing I wanted to touch on

1 was the number of your own uses of pepper spray.
2 It was talked about that this incident at Woody's
3 you were off duty. Was that something you would
4 often do --
5 A. Yes.
6 Q. -- work off duty? And it was always at locations
7 that would typically be more high volume uses of
8 pepper spray or pepper balls?
9 A. Yeah. Typically, the bars that had the problems
10 with crowds are the ones that hired officers off
11 duty, and I did that quite often during those
12 years.
13 Q. In order to supplement your income?
14 A. Yes.
15 Q. So you were putting yourself in a position where
16 this would more regularly take place, which would
17 likely contribute to your increased number of
18 usage?
19 A. Yes.
20     MR. ZIEMER: Okay. That's all I have.
21     MR. SCHMITT: We --
22     MR. MACER: I'll object to both of you asking
23 questions.
24     MR. SCHMITT: Yeah, I thought you would. I
25 just have just one.

1     MR. MACER: Want to go off the record?
2     (A discussion was held off the record.)
3 Q. Mike, when you first arrived onto the scene, you've
4 indicated you gave verbal directions to leave the
5 lot. Were people complying with those orders?
6 A. Yes. As I made my way into the lot, I, of course,
7 contacted people, part of the outer group towards
8 the building, began giving those commands to leave.
9 The majority of the people that I walked past did
10 comply with that. They began heading towards the
11 exit of the lot once I was in the parking lot. I
12 made the decision that if I made contact with, you
13 know, a more resistant group that maybe wouldn't
14 leave, that I was going to deal with them before
15 putting myself between that group and then the
16 larger group. So I wanted to see that I was
17 gaining compliance as I was walking through before
18 I got to that group, and that was -- that was
19 occurring for the most part.
20     MR. SCHMITT: None other.
21     MR. MACER: No other questions.
22     MR. SCHMITT: Mike, we're going to have you
23 sign.
24     (The deposition concluded at 3:34 p.m.)
25