UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| KIVON D. REDD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO.: 3:12-cv-70-RLY-WGH |
| | ) |
| THE CITY OF EVANSVILLE, et. al. | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Kivon D. Redd ("Redd"), by counsel, hereby respectfully submits his Response in Opposition to the Defendants' - City of Evansville, Indiana ("City"), Michael R. Ward ("Officer Ward"), John Pieszchalski ("Officer Pieszchalski") and Brad Hill ("Chief Hill") known collectively as ("Defendants") Motion for Summary Judgment.

## I.    INTRODUCTION

On May 28, 2010, the Evansville Police Department ("EPD") responded to the report of an argument in the parking lot of the Scottish Rite where there had been a high school graduation party of approximately sixty (60) people, who were mostly minors.  Defendants – Officer Ward and Officer Pieszchalski arrived on the scene without lights or sirens and within sixty (60) seconds pepper sprayed the entire crowd, without warning, instead of apprehending the two (2) teenagers arguing, who were never arrested.  The indiscriminate use of the pepper spray sent the situation into a panic where attendees were trying to leave the scene, but could not because the only point of exit was blocked due to the disorientation and panic caused by the pepper spray.

Redd, who was in the parking lot, was one of the innocent bystanders that was hit by the pepper spray. After Redd questioned why he was sprayed, the officers arrested him.  Redd then

spent the night in jail on charges of disorderly conduct and resisting arrest. Redd was found not guilty when the jury returned a verdict within minutes.

In his Complaint, Redd alleges that his rights as protected by the 4th, 5th and 14th Amendments of the United States Constitution have been violated by the Defendants' actions and that he was the victim of excessive force, false arrest, false imprisonment and battery

Defendants had no reason to spray Redd in the first place. Then they had no probable cause to arrest him for simply complaining about being sprayed and further used excessive force in doing so. Their actions were all consistent with the City's widespread practices and written policies which allow the use of pepper spray as a matter of officer convenience even if it is going to unnecessarily harm innocent bystanders and whether or not other less forceful means are available. Furthermore, the City has sanctioned officers arresting whoever complains about being sprayed. Such actions have occurred routinely by City Officers and in particular by Officer Ward who did not even have the training required for him to carry the pepper spray extinguisher.

## II. STATEMENT OF GENUINE ISSUES OF FACT

### A. Response to the Defendants' "Statement of Material Facts Not in Dispute"

For ease of reference, Plaintiff repeats the disputed fact in italics with his response immediately following.

*"Approximately one hundred (100) guests attended the party. Damita Thompson's Dep. p. 13: 5-6."* [Defendant's Memorandum in Support at pg. 2] *"One of the first police officers to arrive on the scene, later that evening, also stated that, in his professional opinion, the crowd's behavior was indicative of being under the influence of drugs or alcohol. Michael Ward's Dep. p 51: 5-8."* [Defendant's Memorandum in Support at pg. 3]

RESPONSE: Disputed. On May 29, 2010, Nikita Owens had an alcohol and drug free graduation party at the Scottish Rite with about fifty (50) to seventy-five (75) guests and

chaperones. [Exhibit A – N. D. IA Statement at CE 788; Exhibit B – N.O. IA Statement at CE 844, 857-858; Exhibit C – N.R. IA Statement at CE 895; Exhibit D –Redd Trial Transcript at 120] Redd was not drinking alcohol or using drugs nor did he witness anyone else drinking alcohol or using drugs. [Exhibit E – Redd Dep. pgs. 27 & 28]

*"Ward then obtained his pepper spray canister from the trunk of his car, as he is trained in the use of pepper spray and in his experience, finds pepper spray to be an effective crowd control measure, when verbal orders are not followed. Pieszchalski's Dep. p. 8: 4-8; Ward's Dep. pp. 46: 12-25, 47: 1-25, 48: 1-9."* [Defendant's Memorandum in Support at pg. 5]

RESPONSE:     Disputed.   Ward did not have the required training to allow him to carry the weapon that he used to deploy the pepper spray.  [Exhibit H - Hill Dep. p. 56; Exhibit I – EPD Use of Force SOP at CE 89, 90; Exhibit J – CALEA Assessment Report at 445; Exhibit K – Ward's Training History] Officer Ward did not receive OC canister training in 2008 or 2009. [Id.]   Nevertheless, Officer Ward believes he has used pepper spray more than any other officer with the EPD.  [Exhibit L – Ward Civil Dep. pgs. 53-54]

*After repeated commands to leave, there was no effort by the crowd to make any movement towards their vehicles. Ward's Dep. pp. 70: 23-25, 71, 1-3."* [Defendant's Memorandum in Support at pg. 6]

RESPONSE:     Disputed.   Officer Ward and Officer Pieszchalski quietly arrived on the scene without their lights or sirens engaged and parked outside the lot. [Exhibit N – Ward IA Statement at CE 987; Exhibit O – Ward Crim. Dep. p. 18]  Upon their arrival, they saw small pockets of people in groups of two (2) to five (5) people spread throughout the entire parking lot and in front of the entrance of the Scottish Rite, while people continued to come out of the building towards the parking lot [Exhibit D – Redd Trial Transcript - Ward Testimony at 28] Officer

Pieszchalski agrees that several people in the crowd probably did not know the Officers were there until they were pepper sprayed because he said "nobody could hear me over them even though I'm yelling as loud as I can." [Exhibit P - Pieszchalski Civil Dep. p. 19; Exhibit G - Pieszchalski Crim. Dep. p. 17-18] Officer Pieszchalski only said leave three (3) or four (4) times when he was hit with pepper spray from Officer Ward. [Id.] According to Officer Ward, people in the crowd that saw them began "to disperse just from our presence." [Exhibit O – Ward Criminal Dep. p. 19] Further, Ward testified that "the group actually stopped fighting when we arrived at the group's location." [Exhibit O – Ward Criminal Dep. p. 25; Exhibit N – Ward IA Statement at CE 988] In his affidavit of probable cause, he swore that as he gave commands for the crowd to disperse and "the majority began to walk away." [Exhibit Q – Affidavit for Probable Cause at CE 1022]

*"Plaintiff, despite having the ability to get into his car and leave (Plaintiff's Dep. pp. 81: 24-25, 82: 1) made the conscious decision to stay in the parking lot. Plaintiff's Dep. p. 63: 21-23."* [Defendant's Memorandum in Support at pg. 6]

RESPONSE:    Disputed. When leaving the party, Redd stopped to socialize with others on his way to his truck. [Exhibit E - Redd Dep. p. 95] In the meantime, the two individuals unknown to him resumed arguing in the parking lot. [Exhibit F - Redd IA Statement at CE 754] The two arguing were separated by others in the crowd. [Exhibit D – Redd Trial Transcript at 143] Redd's friend Kendal Brown (who had rode with Redd) stepped in to help calm down the situation and told them to "chill out." [Exhibit F - Redd IA Statement at CE 754; Exhibit D – Redd Trial Transcript at 132] Redd followed Brown to the area where the two were arguing. [Exhibit D - Redd Trial Transcript. p. 133; Exhibit E - Redd Dep. p. 33] Brown, along with other bystanders, helped diffuse the situation. [Exhibit B – N.O. IA Statement at CE 848-849; Exhibit D - Redd Trial Transcript at 134; Exhibit F - Kivon IA Statement at CE 754]

*"Eventually, one of the shirtless individuals who had been held back, broke free from the restraints, and the two crowds came together to form a "fight ball." Pieszchalski's Dep. p. 8: 19-20, Ward's Dep. p. 32: 7-8." "The crowd was preventing the officers from getting inside the "ball" and helping someone who was potentially getting hurt. Pieszchalski's Dep. pp. 42: 20-25, 43: 8-13. It became necessary to break the concentration of the crowd, who were preventing the officers from doing their duty. Pieszchalski's Dep. pp. 21:5-23, 43: 1-2."* [Defendant's Memorandum in Support at pg. 7]

RESPONSE:   Disputed. According to Redd there was only a small group or about seven (7) to ten (10) people at the location of the verbal argument including those arguing. [Exhibit E - Redd Dep. at p. 36; Exhibit F - Redd IA Statement at CE 754] By the time the officers arrived, the argument was being broken up and there was no physical fighting. [Exhibit B – N.O. Internal Affairs Statement at CE 848-849; Exhibit N - Ward IA Statement at CE 988; Exhibit D - Redd Trial Transcript at 134; Exhibit F - Redd IA Statement at CE 754; Exhibit L - Ward Civil Dep. p. 18; Exhibit O - Ward Criminal Dep. p. 25; Exhibit P - Pieszchalski Civil Dep. p. 18] Officer Ward first claimed that he saw a fight of about a "dozen or more people actively fighting." [Exhibit N – Ward IA Statement at CE 987; Exhibit Q – Probable Cause Affidavit at 1022] That is disputed by Redd, Officer Pieszchalski, the EPD Internal Affairs findings and several other witnesses who say there was never any physical fight. [Exhibit G - Pieszchalski Crim. dep. p. 15; Exhibit R – IA Formal Complaint Summary at CE 702-704; Exhibit A – N.D. IA Statement at CE 785; Exhibit S – D.F. IA Statement at CE 796;  Exhibit T – A.K. IA Statement at CE 806, Exhibit U – D.L. IA Statement at CE 821-827; Exhibit B – N.O. IA Statement at CE 848-849; Exhibit V – S.W. IA Statement at CE 925; Exhibit W – IA map of incident] It was apparent to the officers upon their arrival which two were arguing – the two with their shirts off. [Exhibit L – Ward Civil Dep. pgs. 18, 29-30; Exhibit P - Pieszchalski Civil Dep. pgs. 8 &18; Exhibit G -

Pieszchalski Crim. Dep. p.15; Exhibit D – Redd Trial Transcript - Pieszchalski testimony p. 71]

Officer Ward first claimed that he saw a fight of about a "dozen or more people actively fighting." [Exhibit N – Ward IA Statement at CE 987; Exhibit Q – Probable Cause Affidavit] That is disputed by Redd, Officer Pieszchalski, the EPD Internal Affairs findings and several other witnesses who say there was never any physical fight.  [Plaintiff's Exhibit G - Pieszchalski Crim. dep. pg. 15; Exhibit R – IA Formal Complaint Summary at CE 702-704; Exhibit A – N.D. IA Statement at CE 785; Exhibit S – D.F. IA Statement at CE 796; Exhibit T – A.K. IA Statement at CE 806, Exhibit U – D.L. IA Statement at CE 821-827; Exhibit B – N.O. IA Statement at CE 848-849; Exhibit V – S.W. IA Statement at CE 925]. Moreover, Officer Pieszchalski testified he did not feel threatened and Officer Ward acknowledges prior to using the pepper spray, the crowd was not being antagonistic or in any way threatening to the officers. [Exhibit L – Ward Civil dep. pg. 42; Exhibit P - Pieszchalski Civil dep. p. 20]  Furthermore, Officer Pieszchalski says that the crowd's attention was focused on the people arguing and not anything threatening to the officers. [Exhibit P - Pieszchalski Civil dep. p. 20]  In fact, Ward's prior deposition testimony, affidavit of probable cause and IA Investigation statement all reflect that people began to separate upon his arrival and "the majority" began to walk away before he sprayed the crowd.  [Exhibit O - Ward Crim. Dep. pgs.19 & 25; Exhibit N – Ward IA Statement at CE 988,;Exhibit Q – Probable Cause Affidavit p. 1022]

*"After weighing all of the risks, Ward decided he must do something to disperse the crowd before the situation escalated further. Ward's Dep. p. 50: 3-22. Ward sprayed a quick "one second burst" of spray in an arc over the top of the crowd, so that the spray would "rain down" on them, and disperse the crowd. Ward's Dep. pp. 41: 3-23. After deploying the pepper spray, the crowd dispersed as it was intended. Plaintiff's Dep. p. 126: 2-4."* [Defendant's Memorandum in Support at pg. 8]  *"Before deploying the spray, Ward first considered moving in*

*physically and apprehending the combatants. Ward's Dep. p. 34: 9-13."* [Defendant's Memorandum in Support at pg. 7]

RESPONSE:    Disputed. Officer Ward fired pepper spray within seconds of his arrival at the Scottish Rite. [Exhibit O - Ward Crim. Dep. p. 25] The officers were telling the kids to leave "but before they could actually do that they [were] already shooting the pepper spray." [Exhibit V – S.W. IA Statement CE 918] Officer Ward started spraying without any warning. [Exhibit L – Ward Civil dep. pgs. 41-42]. The officers even sprayed two pregnant girls before they could get to their car [Exhibit V – S.W. IA Statement CE 922] and hit Officer Pieszchalski. [Exhibit G - Pieszchalski Crim. dep. p. 17]

*"Subsequently, Plaintiff admitted that he did not get sprayed directly in the face (Plaintiff's Dep. p. 90: 11-18), but rather on the "side of his face" and the "back/neck" area. Plaintiff's Dep. p. 50: 5-6."* [Defendant's Memorandum in Support at pg. 8]

RESPONSE:    Disputed. The pepper spray hit Redd from behind and got him in the left eye, the left side of his face, his neck and back. [Exhibit D – Redd Trial Transcript at 144-145; Exhibit E – Redd Dep. p. 50] It made him confused, upset, and blind in his left eye. [Id.] His eye, skin and chest had a burning sensation and caused him difficulty breathing. [Id.] Kivon continued to experience effects for days afterwards. [Id. at pg. 113]

*"Plaintiff's demeanor was aggressive in posture, and he was clenching his fists, shouting and stomping his feet. Ward's Dep. p. 72: 21-23."* [Defendant's Memorandum in Support at pg. 8]

*"Ward and Pieszchalski approached Plaintiff and gave repeated commands to "get out of here," "you need to leave," "it's time to go." Pieszchalski's Dep. p. 10: 6-9. Plaintiff kept screaming, and was told, "if you are not going to leave, you will be under arrest…You need to leave now." Pieszchalski's Dep. p. 10: 10-15. Plaintiff still refused to leave, so at that point, Ward told Plaintiff to get on the ground. Pieszchalski's Dep. p. 10: 16-21."* [Defendant's

Memorandum in Support at pg. 9]

RESPONSE:    Disputed. Redd did not clench his fists.  [Exhibit E – Redd Dep. p. 59] After being sprayed, Redd protested saying "why did you spray me?" [Exhibit G - Pieszchalski Crim. Dep. p. 29;  Exhibit O - Ward Crim. Dep. p. 36; Exhibit F – Redd IA Statement p. 755; Exhibit D – Redd Trial Transcript at 135]  In response, Officer Ward said "what did you say, get on the ground." [Exhibit D – Redd Trial Transcript at 135] Officer Ward has previously testified that he could not remember what Redd said specifically, but said that it was "more or less in protest to our actions" in "spraying the crowd." [Exhibit O – Ward Crim. Dep. pgs. 28 & 36]  Likewise, Officer Pieszchalski does not remember Redd saying anything before being arrested other than complaining about being sprayed. [Exhibit G - Pieszchalski Crim. Dep. p.29; Exhibit D – Redd Trial Transcript at 74-75] Then when Redd was asked to get on the ground and he complied and put his hands up.  [Exhibit D – Redd Trial Transcript at 118, 136; Exhibit F – Redd IA Statement p. 755] Brown offered to drive Redd home, but Officer Ward refused.  [Id.] Then the officer came and put his foot in his back.  [Exhibit D – Redd Trial Transcript - Brown testimony pgs. 129, 137]  Brown protested the officer doing that and then called his grandfather because Redd did not resist at all.  [Id. at 128-129]

*"Plaintiff got on the ground, but kept his hands underneath him. Pieszchalski's Dep. p. 10: 22-23; Ward's Dep. p. 74: 11-21. Ward and Pieszchalski were forced to get on their knees, and Ward placed his knee in Plaintiff's back, in order to get leverage, to allow for Pieszchalski to grab his right wrist and Ward to grab his left wrist, out from under his torso. Pieszchalski's Dep. p. 11: 1-9; Ward's Dep. p. 74: 11-21."* [Defendant's Memorandum in Support at pg. 9]
*"Plaintiff continued to roll, and rock his shoulders, even after he was cuffed, so Pieszchalski placed his knee in the small of Plaintiff's back to restrain him. Pieszchalski's Dep. p. 11: 17-22. Plaintiff claims this is inaccurate, and that in fact, Pieszchalski stood on his back. Plaintiff's*

*Dep. p. 70: 1-2. This claim is made, despite the fact that in his own Complaint, Plaintiff alleged that Pieszchalski placed his "knee or his foot" on his back. Plaintiff's Complaint (Doc. 1) ¶ 20."* [Defendant's Memorandum in Support at pg. 10]

RESPONSE:   Disputed. After being told to get on the ground because he was under arrest, Redd did so face down and complied. [Exhibit D – Redd Trial Transcript at 136; Exhibit F – Redd IA Statement CE 755]   Brown offered to drive Redd home, but Officer Ward refused.  [Exhibit D – Redd Trial Transcript at 118, 136; Exhibit F – Redd IA Statement p. 755] Then the officer came and put his foot in his back.  [Exhibit D – Redd Trial Transcript - Brown testimony pgs. 129, 137]  Brown protested the officer doing that and then called his grandfather because Redd did not resist at all.  [Id at. 128-129] Officer Ward claims it was his knee in Redd's back.  [Exhibit O - Ward Crim. Dep. pgs. 33-34]  While Officer Pieszchalski claims that he had a knee in Redd's back while arresting him and after handcuffing him.  [Exhibit G - Pieszchalski Crim. Dep. pgs. 26-27] Officer Pieszchalzki also admits Redd never used force.  [Id.]

 *"After a lengthy investigation, neither Internal Affairs, nor Chief Hill, found fault in the conduct of the officers at the Scottish Rite. Hill's Deposition. p. 8: 13-20.*

RESPONSE:   Disputed. Chief Hill agrees that things could have been handled differently by his officers.  [Exhibit H - Hill Dep. p. 60]   In a statement for the press, Chief Hill wrote - "The officers chose to utilize a department approved, less than lethal force option that is effective at dispersing crowds – pepper spray." [Exhibit H - Hill Dep. pg. 108; Exhibit M – Hill Press Statement at p. 1484]  He also admitted that the "first arriving officers [could] have stood by on arrival and waited for additional officers, before taking action," and said "Could we have done some things differently? Yes."   [Id.]   "The officers could have used a PA system on their vehicles to better disperse the crowd."  [Id.] "The officers could have given orders with a specific time line for compliance."  [Id.] "The officers made a tactical mistake by separating, which

resulted in one officer being pepper sprayed." [Id.] "As a result, we will be providing our officers with more training on crowd control techniques." [Id.] "There were people who were affected by the pepper spray who were just in the wrong place at the wrong time." [Id.] Chief Hill acknowledged that they have "dealt with this type of situation" of dispersing crowds several times in the past and then concluded "I ruled that these officers are exonerated from the complaint of excessive force and I support them in their actions." [Id. at 1486]

### B. STATEMENT OF ADDITIONAL MATERIAL FACTS

1. Redd was nineteen (19) years old on May 28, 2010. Redd is a student at Indiana University – Kelley School of Business, who will be graduating in December 2014, earning his Bachelor's Degree in Marketing, with a Minor in telecommunications. [Exhibit E - Redd Dep. pgs. 6 &7]

2. Redd was invited to the party at the Scottish Rite and he arrived with Kendal Brown and Diana Snaden. [Exhibit E - Redd Dep. pgs. 19 & 20]   Redd did not consume any alcohol at the party and he did not witness anyone else consuming alcohol. [Exhibit E - Redd Dep. pgs. 27 & 28; Exhibit D –Redd Trial Transcript 112-113]

3. At some point, some uninvited guests showed up to the party. These uninvited guests caused the party to end early, and the EPD was called. [Exhibit B – N.O. IA Statement CE 845-849] The disagreement spread to the parking lot, but according to eye witness accounts there was never actually a "physical fight."  It was just a verbal argument between D.L. and J.J. [Exhibit R – IA Formal Complaint Summary at CE 702-704; Exhibit S – D.F. IA Statement at CE 796; Exhibit T – A.K. IA Statement at CE 806, Exhibit U – D.L. IA Statement at CE 821-827; Exhibit B – N.O. IA Statement at CE 847-857; Exhibit V – S.W. IA Statement at CE 925; Exhibit W – IA map of incident] By the time the EPD arrived, the argument was being broken up.  [Exhibit B – N.O. IA Statement CE 845-849,  Exhibit N – Ward IA Statement CE 988; Exhibit F – Redd IA

Statement CE 754; Exhibit O – Ward Criminal Dep. pgs. 18, 25, 29; Exhibit P - Pieszchalski Civil Dep. pgs. 8 &18]

4. Officer Ward and Office Pieszchalski arrived on the scene without their lights or sirens engaged and parked outside the lot. [Exhibit N – Ward IA Statement CE 987; Exhibit O - Ward Crim. Dep. p. 18] Upon their arrival, they saw small pockets of people in groups of two (2) to five (5) people spread throughout the entire parking lot and in front of the entrance of the Scottish Rite, while people continued to come out of the building towards the parking lot. [Exhibit D – Redd Trial Transcript at 28; Exhibit G - Pieszchalski Crim. Dep. pgs. 15-16]

5. The EPD records show that the first responding officers were Officer Ward and Officer Pieszchalski "were about to arrive" at 29:35. [Exhibit X- IA Investigation Timeline] The second unit of officers - Officer Craig and Officer Hirshman arrived at 32:28. [Id.] Officer Fair arrived twenty-seven (27) seconds later, who only dealt with traffic, and Officer Winsett who arrived less than a couple of minutes after that also was not involved in any of the use of force. [Exhibit Y – Email of Officer Dennis Fair, Exhibit X – IA Timeline of Events] Several additional officers arrived shortly thereafter with as many as fifteen (15) total officers responding. [Exhibit Z – Dispatch Records; Exhibit L – Ward Civil Dep. pgs. 24-25, Exhibit P – Pieszchalski Civil Dep. pg. 14]

6. Officer Ward used a MK 46 riot extinguisher, which is an optional weapon that he bought for himself. [Exhibit L – Ward Civil Dep. pg. 33; Exhibit AA - Training material at pg. 5; Exhibit I – EPD Use of Force SOP at CE 89-90; Exhibit H - Hill Dep. pg. 21] However, Officer Ward did not have the required training to allow him to carry that weapon. [Exhibit H - Hill Dep. pg. 56; Exhibit I - Use of Force SOP at CE 89-90; Exhibit J – CALEA Assessment; Exhibit K – Ward Training History] Nevertheless, Ward believes he has used pepper spray more than

anyone else on the force.  [Exhibit L – Ward Civil Dep. pgs. 53-54.]  Ward admits he was not

trying to spray anyone in particular - not even the people involved in the argument.  [Id. p. 32;

Exhibit N – Ward IA Statement at CE 1004]

7.  Prior to the Scottish Rite incident, Officer Ward had been in various positions where he

had to deal with crowd control issues. [Exhibit L – Ward Civil Dep. pgs. 12-17; Exhibit BB -

Ward use of force reports and incident reports]  In particular it was common to deal with people

in the context of a bar closing or some allegation of a fight or other disorderly conduct type of

situation.  [Exhibit L – Ward Civil Dep. pg. 12]  He typically dealt with crowds of "hundreds" of

people. [Id. at pg. 13]  When responding to runs of one hundred (100) people or so, normally six

(6) to twelve (12) officers would respond.  [Id. pgs. 15-16]  Typically, if they found there to be

an unsafe crowd environment, they would ask the crowd to leave and it would usually take a

crowd of one hundred (100) people about fifteen (15) to twenty (20) minutes to get out of the

parking lot. [Id. pg. 17; Exhibit P – Pieszchalski Civil Dep. pg. 17]

8.  Prior to this incident, Officer Ward had been the subject of approximately six (6) internal

affairs complaints for use of force. [Exhibit O - Ward Crim.  Dep. pgs. 5-6]  Officer Ward has

also been counseled for his lack of judgment when he once chased down an allegedly dangerous

driver at high rates of speed, when he was off duty with his family in the car, and ran off the road

in doing so.  [Exhibit CC - Ward Summary of Counseling;  Exhibit L]Then he did not even issue

a ticket. [Id.] Officer Ward is known to be an "active" officer who has been criticized for

needing "more time and patience" and getting "excited in large crowd situations."  [Exhibit CC –

Ward Supervisory Review and Counseling Records]

9.  The EPD routinely approved Officer Ward's and others use of force in pepper spraying

innocent bystanders simply as a general crowd control measure. [Exhibit L – Ward Civil Dep.

pgs. 79-81, 83&85; Exhibit BB - Ward Use of Force and Incidents Reports; Exhibit CC – Ward Supervisory Review and Counseling Records; Exhibit H - Hill Dep. pgs. 21-22]  Officer Ward has used pepper spray or pepper balls on a crowd with innocent bystanders at least thirteen (13) occasions from 2008 through 2012. [Exhibit BB - Ward Use of Force and Incidents Reports]

10.  In this case, when asked why he didn't just apprehend the two teenagers arguing, Officer Ward said "it crossed my mind, but as with any other decision-making process we do, it wasn't feasible at the time." [Exhibit L – Ward Civil Dep. pg. 34]  He said it was not feasible because of the danger to himself and Officer Pieszchalski.  [Id.]  However, Officer Pieszchalski testified he did not feel threatened and Officer Ward acknowledges prior to using the pepper spray, the crowd was not being antagonistic or in any way threatening to the officers.  [Id. pgs. 34, 41-42, Exhibit P - Pieszchalski Civil Dep. pg. 20]  The crowd's attention was focused on the people arguing and not doing anything threatening to the officers. [Id.]

11.  Officer Ward justified his actions in spraying the whole crowd (including Officer Pieszchalski) by saying that everyone was trespassing, which he defined as anyone not dispersing with in "fifteen seconds" of being asked.  [Exhibit L – Ward Civil Dep. pgs. 35-36]  However, no one was charged with trespassing and Redd denies he ever heard anyone ask him to leave the parking lot before being sprayed. [Exhibit E – Redd Dep. pgs. 45-46]  Officer Ward admits that the necessary arrests could have been made without using the pepper spray.  [Exhibit L – Ward Civil Dep. pg. 72]  Chief Hill agrees that things could have been handled differently by his officers.  [Exhibit H - Hill Dep. pgs. 45,51,59-60; Exhibit M – Hill Press Statement]

12.  Pepper spray is just one way to disperse a crowd, and it is not necessary for officers to be able to perform their normal job functions. [Exhibit H - Hill Dep. pgs. 21-22, 45,49; Exhibit L – Ward Civil Dep. pg. 48-49]   Other methods available to the officers to disperse a crowd include

the following: Using lights and sirens. [Exhibit L – Ward Civil Dep. pgs. 48-49]; Yelling louder for people to leave. [Id.]; Using a PA system. [Id.]; Threatening arrest. [Id.]; Threatening pepper spray. [Id.]; Giving a warning shot of spray. [Exhibit H - Hill Dep. pg. 59]; Waiting for more officers to arrive. [Exhibit H - Hill Dep. pg. 45, Exhibit P – Pieszchalski Civil Dep. pg. 38]; and, Asking the specific people causing the problem to leave. [Exhibit L – Ward Civil Dep. pgs. 48-49; Exhibit H - Hill Dep. p. 89]

13. Pepper spray cause visual impairment as well as gripping pain, burning in the respiratory track, burning skin, anxiety, fear and panic. [Exhibit P - Pieszchalski Civil Dep. pg. 29; Exhibit AA - Safariland Training pgs.1-3.] Overall, Officer Pieszchalski describes being hit with pepper spray as "an hour of suck." [Exhibit P – Pieszchalski Civil Dep. pg. 35]

14. Even if the people could see to drive after being sprayed, many people trying to leave could not get out. [Exhibit A – N.D. IA Statement at CE 786] For instance, N. D., tried to drive her friend N. R. after she had been sprayed in the face but pepper balls were being sprayed "everywhere" and they had to wait in a long line of cars before they could get out. [Id.; Exhibit C – N.R. IA Statement at CE 892; Exhibit DD – Officer Marcus Craig IA Statement at CE 936]

15. The EPD's specific SOP on Chemical Weapons states, in pertinent part, "Chemical weapons are designed to incapacitate an individual who is physically resisting arrest or attacking an officer or other person or for crowd management." [Exhibit I – EPD Use of Force SOP at CE 83] Other than the SOP on Chemical weapons authorizing the use of chemical weapons for crowd management, there is no written SOP on crowd management. [Exhibit I – EPD Use of Force SOP] The standard authorized practice for crowd control was simply to allow officers to use chemical weapons on crowds involving innocent bystanders at their discretion and whether

or not they were attempting to make an arrest.  [Exhibit L – Ward Civil Dep. at pgs. 83&85; Exhibit H - Hill Dep. pgs. 21&22; Exhibit BB – Ward Use of Force and Incidents Reports]

16.  The EPD written Rules and Regulations on the use of force generally say: "A member may use force, including deadly force, only when legally justified and when all other reasonable means of accomplishing a lawful police purpose have failed, or when a member reasonably believes that no other method can accomplish his intended purpose."  [Exhibit EE – EPD Use of Force Regulations - Article 2 Chapter 5 – Use of Force Section 1]

17.  Further instruction on use of force is addressed by EPD's SOP's. [Exhibit I – EPD Use of Force SOPs at CE 73-91]  However, even Chief Hill himself cannot accurately explain them. [Exhibit H - Hill Dep. pgs. 15-16] When asked "do you know generally what that use of force regulation says," his response is "generally something to the effect of using the amount of force necessary. I'm guessing.  I don't recall exactly what it says in the rules and regulations."  [Id. at pg. 15]  And when asked "what are the policies in regards to when its appropriate to use pepper spray?," his answer is "I don't believe we get that specific in the policy."  [Id. at pg. 16]  Chief Hill only expects his officers to have "a general knowledge of those guidelines." [Id. at pgs. 16&23]

18.  Further Chief Hill has commented that the EPD use of force procedures are "guidelines, they're not necessarily written in stone" and he has said in that regard "the officers do have a great deal of discretion on how they proceed on a daily basis."  [Exhibit FF – Minutes from Meeting of Police Merit Commission]

19.  The wide spread unwritten standard practice accepted by the EPD is to allow the use of chemical weapons for crowd control including use against innocent bystanders as they see fit. [Exhibit L – Ward Civil Dep. pg. 79-81, 83&85; Exhibit CC – Ward Supervisory Review and

Counseling Records at CE 1243; Exhibit FF – Minutes from Meeting of Police Merit Commission; Exhibit H - Hill Dep. pgs. 8, 10, 13, 21-22, 51, 54, 58-60,71; Exhibit BB - Ward Use of Force Reports and Incident Reports]

20. Any physical force, including pepper spray, must be reported in a "use of force" report and reviewed for completeness and accuracy by the appropriate Sergeant with notification of each step in the chain of command up to the Chief. [Exhibit I at CE 89]

21. At the time of the event, Brad Hill was the police chief and ultimate decision-maker for the EPD on policy and discipline. [Exhibit H - Hill Dep. pg. 13] In this case, Chief Hill found that the officers did not violate any of the EPD policies. [Id. at pgs. 13, 51, 52] In Chief Hill's evaluation of the incident he did not believe a single portion of Redd's statements which conflicted with the officer's testimony. [Id. at pg. 114]

22. Even though, Chief Hill is not aware of "a specific thing that (Redd) did wrong" prior to being pepper sprayed, he still found no violations of EPD policy and approved the general use of pepper spray on the crowd. [Id. at pgs. 21, 58-59]

23. In a draft statement for the press, containing his unedited thoughts, Chief Hill wrote- "The officers chose to utilize a department approved, less than lethal force option that is effective at dispersing crowds – pepper spray." [Exhibit H - Hill Dep. pg. 108; Exhibit M – Hill Press Statement at CE 1484] He also admitted that the "first arriving officers [could] have stood by on arrival and waited for additional officers, before taking action," and said "Could we have done some things differently? Yes." [Id.] "The officers could have used a PA system on their vehicles to better disperse the crowd." [Id at 1485] "The officers could have given orders with a specific time line for compliance." [Id.] "The officers made a tactical mistake by separating, which resulted in one officer being pepper sprayed." [Id.] "As a result, we will be providing our

officers with more training on crowd control techniques." [Id.] "There were people who were affected by the pepper spray who were just in the wrong place at the wrong time." [Id.] Chief Hill acknowledged that they have "dealt with this type of situation" of dispersing crowds several times in the past and then concluded "I ruled that these officers are exonerated from the complaint of excessive force and I support them in their actions." [Id. at 1486]

24. After the Scottish Rite incident new crowd control guidelines which could have been used to avoided that incident. [Exhibit JJ – Crowd Management Memorandum]

**25.** Eventually, Kivon was tried for the alleged crime of disorderly conduct and resisting arrest, but he was found not guilty of the charge of resisting arrest; and the trial Judge, dismissed the disorderly conduct charge finding that the complaints made by Kivon about being sprayed were protected free speech under the Indiana Constitution. [Exhibit D – Redd Criminal Trial Transcript at 106-107]

### III. ARGUMENT

#### A.    STANDARD ON SUMMARY JUDGMENT

The issue on summary judgment "is whether a rational trier of fact could reasonably find for the party opposing the motion with respect to the particular issue." *Medina v. Time Ins. Co.*, 3 F.Supp.2d 996, 997 (S.D.Ind. 1998); *Holtz v. Hilliard*, 1 F.Supp.2d 887, 889-890 (S.D.Ind. 1998). It is well settled in this Circuit that "[s]ummary judgment is appropriate only when the materials before the court demonstrate that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Sarsha v. Sears, Roebuck & Company*, 3 F.3d 1035, 1038 (7th Cir. 1993) (emphasis added). Summary judgment was not designed to be a "paper trial." *Waldridge v. American Hoechst Corporation*, 24 F.3d 918, 920 (7th Cir. 1994). Nor is it a substitute for a trial on the merits. *Shager v. Upjohn Company*, 913 F.2d 398, 403 (7th Cir. 1990). The Court's role does not include weighing the evidence, determining credibility

issues, or resolving swearing contests. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109

F.3d 406, 410 (7th Cir. 1997) (and cases cited therein). Instead, resolving inferences in the light

most favorable to the nonmoving party, it is to determine whether the evidence reveals any

genuine issue of material fact. *Id*. If so, the case must go to the jury.

The Seventh Circuit holds that summary judgment is frequently inappropriate in

excessive-force cases. *Phillips v. Cmty. Ins. Corp.,* 678 F.3d 513, 520 at FN 4 (7th Cir. 2012).

Also, a jury should be left to decide whether or not there a plaintiff's arrest was supported by

probable cause with regard to a plaintiff's claims for false arrest and false imprisonment. *Abbott*

*v. Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013).


### B.     REDD'S 42 U.SC. § 1983 CLAIMS FOR UNREASONABLE SEIZURE, EXCESSIVE USE OF FORCE, FALSE ARREST AND VIOLATION OF HIS DUE PROCESS RIGHTS UNDER THE UNITED STATES CONSTITUTION.

#### i.     Background

In his Complaint, Redd contends that his Civil Liberties as protected by the Fourth,

Fifth and Fourteenth Amendments of the United States Constitution were violated when the

Defendants, acting under the color of State law, deprived him of his due process rights, by

pepper spraying him, seizing and/or arresting him without probable cause and using additional

unreasonable and excessive force when effectuating the arrest.[1]

---

[1] Defendants have continually asserted that the Officers' actions were within the policies of the City and have not asserted the defense of qualified immunity, which is not applicable to claims such as Redd's because it is clearly established that police officers do not have the right to use excessive force including shoving, pushing, or otherwise assaulting innocent citizens without any provocation whatsoever. *Phelps v. City of Indianapolis*, 2004 U.S. Dist. LEXIS 9151.

### ii. False Arrest

The Fourth Amendment prohibits unreasonable seizures. Under the Fourth Amendment, an arrest is the archetype example of a seizure[2]. To be deemed reasonable, a warrantless arrest made in public must be supported by probable cause. *United States v. Watson*, 423 U.S. 411, 414-24 (1976). The existence of probable cause is an absolute defense to a § 1983 claim for false arrest. *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). As such, the key issue in this matter is whether Officer Ward had sufficient probable cause to seize and arrest Redd.

> "The existence of probable cause is necessary but not sufficient for an arrest to be reasonable; the reasonableness of an arrest depends both on its justification and the manner in which it was effectuated. Probable cause to arrest exists if the totality of the circumstances known to the officer at the time of the arrest would warrant a reasonable person in believing that the arrestee had committed, was committing, or was about to commit a crime. It is a practical, commonsense standard that requires only the type of fair probability on which reasonable people act."

Quoting *Gutierrez v. Kerman*, 722 F.3d 1003, 1007-1008 (7th Cir. 2013) internal citations omitted. Determining whether an officer had probable cause to arrest entails a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant. *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996); *Tebbens v. Mushol*, 692 F.3d 807, 819 (7th Cir. 2012).

Defendants contend that Redd's false arrest and seizure claim must fail because Officer Ward had probable cause to arrest Redd for disorderly conduct and resisting law enforcement. [Defendant's Memorandum in Support at pg. 15] The underlying elements for the crimes Redd was arrested for are:

---

[2] Redd acknowledges under Indiana law, his common law claims for false arrest and false imprisonment are one and the same and reviewed under the same standard used a Fourth Amendment false arrest claim. See *Row v. Holt*, 864 N.E.2d 1011 (Ind. 2007). As such, this section contains the argument for each such claim.

**Disorderly conduct**

Sec. 3. (a) A person who recklessly, knowingly, or intentionally:
(1) engages in fighting or in tumultuous conduct;
(2) makes unreasonable noise and continues to do so after being asked to stop; or
(3) disrupts a lawful assembly of persons;
commits disorderly conduct, a Class B misdemeanor.
**Indiana Code § 35-45-1-3**

**Resisting law enforcement**

 Sec. 1. (a) A person who knowingly or intentionally:
 (1) forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties;
 (2) forcibly resists, obstructs, or interferes with the authorized service or execution of a civil or criminal process or order of a court; or
 (3) flees from a law enforcement officer after the officer has, by visible or audible means, including operation of the law enforcement officer's siren or emergency lights, identified himself or herself and ordered the person to stop;
commits resisting law enforcement, a Class A misdemeanor.
**Indiana Code § 35-44.1-3-1**

Officer Ward did not have probable cause to arrest Redd for either one of these alleged offenses. It is undisputed that Redd was not one of the combatants nor was he engaging in tumultuous conduct. Likewise, there is no evidence that Redd was making unreasonable noise or that he continued doing so after being told to stop. Also, he was not disrupting a lawful assembly. Moreover, he did not forcibly resist, obstruct or interfere with the officers and he did not attempt to flee from the officers.

Additionally, the speech he used is of no consequence. Importantly, the only thing Redd said to the Officers *prior* to his arrest was "Why did you spray me." [Exhibit P – Pieszchalski Civil Dep. pg. 29; Exhibit D – Redd Trial Transcript at 128 & 135; Exhibit F – Redd IA Statement at CE 755]  All of the other comments cited in the Defendants' Memorandum were made *after* Redd had been handcuffed and arrested.  It is well settled that the First Amendment protects even profanity laden speech directed at a law enforcement officer and law enforcement

officers are expected to exercise a higher degree of restraint than an average citizen in the face of such speech. *City of Houston v. Hill*, 482 U.S. 451, 461-462 (1987). Merely being belligerent and arguing with a law enforcement officer was not enough probable cause for Officer Ward to arrest Redd for disorderly conduct or resisting arrest. *Gonzalez v. City of Elgin*, 578 F.3d 526, 538 (7th Circ. 2009); *Payne v. Pauley*, 337 F.3d 767, 776-778 (7th Circ. 2003).

Furthermore, Officer Ward's Probable Cause Affidavit for Redd's arrest makes no mention that he asked or directed Redd to quiet down his protests nor did he mention doing that when asked at his deposition or in his Internal affairs interviewed when asked what he did. [Exhibit Q – Probable Cause Affidavit; Exhibit D – Redd Trial Transcript pgs. 45-47]

After Redd protested being sprayed, Officer Ward approached him and said "What did you say, get on the ground." [Exhibit D – Redd Trial Transcript p. 135; Exhibit F – Redd IA Statement at CE 755]. At that time, Kendal Brown, who rode to the party with Redd, stepped up and said let me take him home. Officer Ward would not allow it and then Redd got down and put his hands up. [Exhibit F – Redd IA Statement at CE 755; Exhibit D – Redd Trial Transcript at 128&136] Then one of the officers came and put his foot in Redd's back. [Id. at 129&137] Brown protested the officer doing that and then called his grandfather because Redd did not resist at all. [Id. at 128-129] A review of Officer Ward's Incident/Investigation Reports from 2008 through 2012 where he used pepper spray and/or pepper balls, shows that Officer Ward has routinely used such force in a way that often causes innocent bystanders to be pepper sprayed. [Exhibit L – Ward Civil Dep. pgs. 79-80, 81, 83] Then he frequently arrests those persons who complain about it. [Exhibit BB – Ward Use of Force Reports and Incident Reports]

Officer Ward and the Defendants have made mention of their belief that everyone in the parking lot was trespassing. This simply will not stand up to the facts. Officer Ward justified his

actions in spraying the whole crowd (including Officer Pieszchalski) by saying that everyone was trespassing, which he defined as anyone not dispersing with in "fifteen seconds" of being asked. [Exhibit O - Ward Crim. Dep. p. 35] However, no one was charged with trespassing and Redd denies he ever heard anyone ask him to leave the parking lot before being sprayed. [Exhibit E – Redd Dep. pgs. 45-46]. Lastly, Redd was an invitee to the party and legally on the property.

Eventually, Redd was tried for the crimes of disorderly conduct and resisting arrest, but he was found not guilty of the charge of resisting arrest; and the trial Judge, dismissed the disorderly conduct charge finding that the complaints made by Redd about being sprayed were protected free speech under the Indiana Constitution. [Exhibit D – Redd Trial Transcript at 106 - 107; See also Defendants' Exhibit 3 - Docket sheet from State v. Redd, 82D02-1007-CM-00704] Redd was found not guilty of resisting law enforcement by a jury of his peers within a matter of minutes from the start of deliberations.

Despite Defendants' reliance on disputed and self-supporting statements, there is a grossly different version of the events at issue which shows that Redd was well within his rights to be where he was, say what he said and not be pepper sprayed or arrested for it. In fact, much of what Defendants rely upon is in fact contradicted by their own statements. Accordingly there is enough evidence and facts in dispute to suggest that Officer Ward did not have probable cause to arrest Redd.

### iii. Unreasonable Seizure and Excessive Use of Force

With regard to Redd's claims for unreasonable seizure and excessive use of force[3], there are two distinct acts by the officers that must be analyzed separately. First, Redd was hit with

---

[3] Redd's excessive use of force claim and unreasonable seizure claim are analyzed under the same reasonableness standard set forth in *Graham*.

pepper spray prior to even being aware that the officers were even present at the Scottish Rite. Secondly, was the use of force during his arrest and while he was in the officers' custody.

Even when a police officer has probable cause to execute an arrest, he still may have committed an unreasonable seizure if, judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest. In making this determination, the Supreme Court has directed courts to consider (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Brooks v. City of Aurora*, 653 F.3d 478, 486 (7th Cir. 2011); see also *Graham v. Connor*, 490 U.S. 396 (1989); *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005). The reasonableness of the force used depends on the totality of the facts and circumstances known to the officer at the time the force is applied. *Garner*, 471 U.S. at 8-9; *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012). It is an objective inquiry, the dispositive question being "'whether, in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an objectively reasonable manner,'" *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013) internal citations omitted.

Although fatal to false-arrest and false-imprisonment claims, the existence of probable cause (or arguable probable cause) to arrest does not affect excessive-force claims, given that the reasonableness of an arrest or other seizure under the Fourth Amendment depends not only on when it is made but also on how it is made. Put differently, even when an officer has probable cause to arrest, the Fourth Amendment prohibits him from employing greater force than is reasonably necessary to make the arrest. *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th

Cir. 2013) internal citations omitted. Moreover, Redd need not show actual physical injury to sustain an excessive force claim. *Baird v. Renbarger,* 576 F.3d 340, 344 (7th Circ. 2009).

### a. Redd is Pepper Sprayed as an Innocent Bystander

It is not disputed that Redd was hit by pepper spray prior to any alleged criminal conduct, he was never a participant in the alleged altercation, he was not a threat to the officers and he was not attempting to flee or evade the officers. In fact, Redd did not even know the officers were there before he was sprayed. Nor did the officers see Redd until the point that Redd complained about being sprayed.

Our Courts have made it clear that a plaintiff who offers no resistance to arresting officers has a clearly established right to be free from the use of pepper spray and excessive physical force. *Suarez v. Town of Ogden Dunes,* 2008 U.S. Dist. Lexis 30263 *26. Courts often have held that it is reasonable to use pepper spray against a suspect who is physically resisting arrest; conversely, when the use of pepper spray is gratuitous or unprovoked, courts often have considered it excessive. *Brooks v. City of Aurora*, 653 F.3d 478, 486 & nn11-12 (7th Cir. 2011) citing *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002); *Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009); *Tracy v. Freshwater*, 623 F.3d 90, 98-99 (2nd Cir. 2010); *Henderson v. Munn*, 439 F.3d 497, 502-03 (8th Cir. 2006); *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994); see also *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, (9th Circ. 2002). Officer Pieszchalski acknowledges the use of pepper spray is generally considered a battery unless the person is somehow defending themselves. [Exhibit P - Pieszchalski Civil Dep. pg. 39]

"Force is reasonable only when exercised in proportion to the threat posed." *Phillips v. Cmty. Ins. Corp*., 678 F.3d 513, 525 (7th Cir. 2012). In *Phillips*, the officers fired rubber bullets

from a distance in an attempt to get a drunk driver to get out of her car. She did not comply and stayed with her legs dangling out the window of her car which was running. The officers justified their use of force by reference to the threat of the running car as a potential weapon. The court found that the "desire to resolve quickly a potentially dangerous situation is not the type of government interest that, standing alone, justifies the use of force that may cause serious injury" and reversed a jury verdict against Plaintiff. *Id.* at 525-526. Then the court remanded the matter for determination of damages. In doing so, the court noted that a touchstone of the *Graham* analysis is evaluating the active resistance and found that Plaintiff did not actively resist. Furthermore the court noted that Plaintiff heard the commands and refused to obey them but presented no immediate threat, and made no attempt to flee or even avoid police fire. [Id.]

Based on these principles, Officer Ward's use of force was unreasonable. There is no dispute that Redd was not one the combatants and was not physically resisting arrest when he was hit with the pepper spray. The Defendants' one and only rationale for the use of pepper spray was for crowd management. However, the disputed facts show that in this instance, such heavy handed use of force was not necessary for crowd management. When Officer Ward was asked why he didn't just apprehend the two teenagers arguing, Ward said "it crossed my mind, but as with any other decision-making process we do, it wasn't feasible at the time." He says it was not feasible because of the danger to himself and Officer Pieszchalski [Exhibit L – Ward Civil Dep. pg. 34] However, Officer Pieszchalski testified he did not feel threatened and Officer Ward acknowledges prior to using the pepper spray, the crowd was not being antagonistic or in any way threatening to the Officers. [Exhibit L – Ward Civil Dep. pgs. 34, 41-42; Exhibit P - Pieszchalski Civil Dep. pg. 20] Furthermore, Officer Ward stated that the crowd's attention was focused on the people arguing and was not doing anything threatening to the officers. [Exhibit L

– Ward Civil Dep. pg. 43] Despite these facts, Officer Ward elected to indiscriminately pepper spray the entire crowd hitting two pregnant women, his own partner and Redd. [Exhibit V – S.W. IA Statement CE 922; Exhibit G - Pieszchalski Criminal dep.17]

Furthermore, Officer Ward should have considered the impact the pepper spray would have on the people's ability to drive when wanting them to leave because the specific effects of pepper spray is to cause visual impairment as well as gripping pain, burning in the respiratory track, burning skin, anxiety, fear and panic[4]. [Exhibit H - Hill Dep. pg.70; Exhibit L - Ward Dep. pgs. 60 & 81; Exhibit P - Pieszchalski Civil Dep. pg. 29; Exhibit AA - Safariland training p.1-3] If Officer's Ward true goal was to safely disperse the crowd, blasting pepper spray over the crowd had the exact opposite effect and, in fact, caused panic and made it difficult for the innocent to leave. [Exhibit C – N.R. IA Statement at CE 888-897; Exhibit A – N.D. IA Statement at CE 786; Exhibit T – A.K. IA Statement at CE 807-810; Exhibit V – S.W. IA Statement at CE 918-925]

Additionally, there were several alternatives available to the officers other than using pepper spray on innocent people. Pepper spray is just one way to disperse a crowd, and it is not necessary for officers to be able to perform their normal job functions. [Exhibit H - Hill Dep. pgs. 21-22, 45, 49; Exhibit L – Ward Civil Dep. pgs. 48-49] Other methods available to the officers to disperse a crowd include the following: using lights and sirens; [Exhibit L – Ward Civil Dep. pgs. 48-49]; asking the specific people causing the problem to leave; [Exhibit L – Ward Civil Dep. pgs. 48-49; Exhibit H - Hill Dep. pg. 89]; yelling louder for people to leave; [Exhibit L – Ward Civil Dep. pgs. 48-49]; using a PA system; [Id.]; threatening arrest; [Id.]; threatening pepper spray; [Id.]; giving a warning shot of spray; [Exhibit H - Hill Dep. pg. 59];

---

[4] Later in the night, Officer Craig said to EPD dispatch: "U getting complaints on us….HAHA pepper spray is not liked by many." [Exhibit GG – Dispatch Communications Transcript]

and, waiting for more officers to arrive.  [Exhibit H - Hill Dep. pg. 45, Exhibit P - Pieszchalski Civil Dep. pg. 38] At the Scottish Rite, the police should have announced their presence with lights, sirens and verbal commands as well as they should have figured out what was going on before immediately spraying the crowd.  [Exhibit E - Redd Civil Dep. pg. 61; Exhibit JJ – Crowd Management Memorandum]  It was not necessary to spray the crowd to get them to disperse. [Id.]

Even Chief Hill agrees that things could have been handled differently by his officers. [Exhibit H - Hill Dep. pgs. 51 & 60]  In a draft statement for the press that contained his editorial thoughts, Chief Hill wrote - "The officers chose to utilize a department approved, less than lethal force option that is effective at dispersing crowds – pepper spray." [Id. pg. 108; Exhibit M – Hill Press Release Statement at CE 1484]  He also admitted that the "first arriving officers [could] have stood by on arrival and waited for additional officers, before taking action," and said "Could we have done some things differently? Yes."  [Id.]  "The officers could have used a PA system on their vehicles to better disperse the crowd."  [Id at 1485] "The officers could have given orders with a specific time line for compliance."  [Id.]  "The officers made a tactical mistake by separating, which resulted in one officer being pepper sprayed." [Id.] "As a result, we will be providing our officers with more training on crowd control techniques."  [Id.]

Particularly damning to Defendants' position is the fact that even Chief Hill acknowledges that there was no need for immediate pepper spray and that the officers could have waited for support.  Based on the facts viewed in the light most favorable to Redd, it is impossible to justify Officer Ward's rush to spray an entire crowd within sixty (60) seconds of arriving to break up a verbal altercation between teenagers.  In sum, within sixty (60) seconds he ran got his pepper spray canister that he did not have the required training to use and began firing

at the crowd in general - shooting his own partner who was proceeding into the crowd to investigate what was going on before starting to use force. If Officer Ward would have taken more than sixty (60) seconds to investigate the situation as Officer Piezchalski was attempting to do, then he would have seen what Redd saw, which was only two teenagers arguing. That would have avoided the chaos that ensued from spraying a crowd of innocent bystanders.

Finally, Defendants rely upon *Sow v. Fortville Police Department* and *Klen* v. *City of Crown Point* to support their position that excessive force was not used in the officers' dealings with Redd. [Defendants' Memorandum in Support pgs. 13-16] Both cases are distinguishable from the facts before the Court as the plaintiff in *Klen* was drunk, actively fleeing from police officers and refused to dismount from his motorcycle before the officers elected to use pepper spray. The officers in *Sow* had ample probable cause to arrest the plaintiff; additionally, pepper spray was not utilized in *Sow*.

Redd has presented facts that could lead a reasonable juror to conclude that the Officers used excessive force when Redd was hit with pepper spray. As such, Defendants' motion on this claim should be denied.

### b. Redd's Arrest

After being blasted with pepper spray and arrested, Redd was held down on his stomach by one of the officers[5] standing on him. [Exhibit D – Redd Trial Transcript at 137 - Redd Testimony] However, when pepper sprayed is used the officers are specifically instructed – "Do not leave the suspect on stomach." [Exhibit I – EPD Use of Force SOP at CE 84] A reasonable juror could conclude that leaving Redd on his stomach to suffer the further effects of the pepper spray was an unreasonable and excessive use of force considering Redd was handcuffed and not

---

[5] The officers' own testimony conflicts on who stood on Redd. [Exhibit O - Ward Crim. Dep. pgs. 33-34; Exhibit G - Pieszchalski Crim. Dep. pgs. 26-27]

actively resisting.  It is well established that the use of any significant force not reasonably necessary to affect an arrest—as where the suspect neither resists nor flees or where the force is used after a suspect's resistance has been overcome or his flight thwarted—would be constitutionally unreasonable. *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 529-530 (7th Circ. 2012).  Redd was subjected to excessive force by the officer standing on his back after he surrendered, was handcuffed and laying on his stomach, also when the officers refused to sit him up to defuse the painful effects of the pepper spray.

### iv.    Monell Liability

In their Memorandum in Support, the Defendants contend that Redd's *Monell* claims against the City fail as a matter of law because his Complaint failed with regard to specificity for such claims.  Municipal liability may be established where the evidence demonstrates one of the following: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law causes a constitutional deprivation; or (3) that the constitutional deprivation was caused by a person with final policymaking authority.  *Baxter By Baxter v. Vigo County School Corp.,* 26 F.3d 728, 734-735 (7th Cir. 1994) (citations omitted).

Redd is able to present evidence and facts that the EPD's express written policies and procedures are flawed to the point they allow the violation of citizens' Constitutional Rights.  Moreover, the EPD has a widespread and well settled practice of abusing use of pepper spray for unnecessary reasons and arresting persons without probable cause, which is evinced through Officer Ward's history of pepper spray use and arrests. Finally, Chief Hill as the final policy making authority, has authorized this continued practices by condoning the abuse and failing to

correct these wrongs even though being aware of the existence of and potential for constitutional rights abuses.

### a. Express Policy

The EPD's specific SOP on Chemical Weapons states in part that "Chemical weapons are designed to incapacitate an individual who is physically resisting arrest or attacking an officer or other person or for crowd management." [Exhibit I – EPU Use of Force SOP at CE 83] Other than the SOP on chemical weapons authorizing their use for crowd management, there is no written SOP on crowd management. The standard authorized practice for crowd control was simply to allow officers to use chemical weapons on crowds involving innocent bystanders at their discretion and whether or not they were attempting to make an arrest. [Exhibit L – Ward Civil Dep. pgs. 79-81,83 & 85; Exhibit H - Hill Dep. pgs. 21-22; Exhibit BB – Ward Use of Force Reports and Incident Reports] Additionally, the EPD written Rules and Regulations on the use of force generally say: "A member may use force, including deadly force, only when legally justified and when all other reasonable means of accomplishing a lawful police purpose have failed, or when a member reasonably believes that no other method can accomplish his intended purpose." [Exhibit EE - Article 2 Chapter 5 – Use of Force Section 1]

Further instruction on use of force is addressed by EPD's SOP's. [Exhibit I – EPD Use of Force SOP at CE 73-91] However, even Chief Hill himself cannot accurately explain them. [Exhibit H – Hill Dep. pgs. 15-16] When asked "do you know generally what that use of force regulation says," his response is "generally something to the effect of using the amount of force necessary. I'm guessing. I don't recall exactly what it says in the rules and regulations." [Id. at pg. 15] And when asked "what are the policies in regards to when its appropriate to use pepper spray?," his answer is "I don't believe we get that specific in the policy." [Id. at pg.16] Chief

Hill only expects his officers to have "a general knowledge of those guidelines." [Id. at pgs. 16 & 23] Further, Chief Hill has commented that the EPD use of force procedures are "guidelines, they're not necessarily written in stone" and he has said in that regard "the officers do have a great deal of discretion on how they proceed on a daily basis." [Exhibit FF – Police Merit Commission Meeting Minutes] The unwritten standard practice accepted by the EPD is to allow the use of chemical weapons for crowd control including use against innocent bystanders as they see fit. [Exhibit L – Ward Civil Dep. pgs. 79-81, 83 & 85; Exhibit CC – Ward Supervisory Review and Counseling at CE 1243; Exhibit FF – Police Merit Commission Meeting Minutes; Exhibit H - Hill Dep. pgs. 8, 10, 13, 21-22, 51, 54, 58-60,71; Exhibit BB – Wards Use of Force Reports and Incident Reports] Furthermore, the EPD has not provided proper training to its officers with regard to the use of pepper spray. The EPD did not provide training to its officers in 2008 or 2009. [Exhibit J; Exhibit K – Ward's Training History]

The EPD's express written policy regarding peppery spray and crowd control gives complete and unfettered discretion to the officers, which directly leads to the violation of citizens' constitutional rights.

### b. Widespread Practice

The EPD has such a wide widespread practice for use of pepper spray against innocent bystanders in a crowd and its officers arresting people, without probable cause, who protest being hit with pepper spray that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law causes a constitutional deprivation.

Redd was limited in his discovery to a timeframe of 2008 through 2012 to explore the use of pepper spray on crowds. Those records demonstrate that Officer Ward used pepper spray or

pepper balls on a crowd on twelve (12) occasions, in addition to the Scottish Rite incident, in that four (4) year period. [Exhibit BB – Ward Use of Force Reports and Incident Reports]  Officer Ward routinely fired pepper spray, in some form, indiscriminately into a crowd containing completely innocent bystanders. [Id.]  Of those thirteen (13) uses of pepper spray on a crowd, Officer Ward arrested seven (7) different people in six (6) of those instances, including Redd. [Id.]  All of those persons protested Officer Ward's use of force, i.e. use of pepper spray, his action or used obscenities prior to being arrested. [Id.] The following are examples of Officer Ward's practice.

On November 28, 2008, Officer Ward, who was off duty, but apparently monitoring EPD's radio traffic, responded to a call of a crowd outside in the parking lot of Woody's Bar at closing time. There were a number of persons in the parking lot including a semi-pro football team and their female friends. EPD Officers, including Officer Ward, demanded the crowd disperse, but the football players stated they were waiting for their coach to drive them home because he had the keys to van.  Officer Ward borrowed a pepper ball launcher and started firing at the crowd.  Officer Ward again demanded they leave, but one of the players stated he could not because he was blinded by pepper spray.  A female friend of the player grabbed the player and put him in her car to leave with another female passenger, Officer Ward continued firing pepper balls into the moving car eventually sending one of the females to the hospital via ambulance. [Exhibit HH – Citizen Complaint – date of occurrence September 7, 2008]  The witness statement from the incident explains that the football players were not fighting and were simply waiting for a ride to go home. [Id.] Moreover, Officer Ward started firing pepper balls within seconds of his alleged arrival and commands. [Id.] For this instance, a Citizen's Complaint was filed and Chief Hill exonerated Officer Ward of any wrongdoing.

On August 2, 2009, Officer Ward was involved in an incident in the parking lot of El Coranchos Restaurant. [Exhibit BB – Incident Report - 08/02/2009]  There were already officers on scene arresting a suspect. [Id.]  A crowd of about thirty (30) people had gathered to protest the arrest. [Id.]  According to Officer Ward, one of the bystanders who was protesting and disagreed with Officer Ward that he needed to leave the property. [Id.] Officer Ward told the person he needed to leave or he would shoot him with pepper balls and arrest him. [Id.]  The individual stood still and put his hands in the air - Officer Ward elected to shoot the individual with three (3) pepper balls and arrest him for resisting law enforcement, trespass and public intoxication. [Id.]

On September 13, 2009, Officer Ward was involved in an incident in the parking lot of Icon nightclub. [Exhibit BB - Incident Report – 09/13/2009]  There was a large group of people exiting the nightclub because it had just closed. [Id.]  An individual was being arrested and Officer Ward fired "numerous pepper ball rounds" into the crowd in order, as he states, to keep the crowd back. [Id.]  Two of the patrons protested the officers' actions. [Id.]  Officer Ward elected to arrest the patrons who were protesting for disorderly conduct, resisting law enforcement, trespass and public intoxication. [Id.]

On November 1, 2009, Officer Ward was involved in another incident in the parking lot of Icon nightclub. [Exhibit BB - Use of Force Report – 11/1/2009; Exhibit II –AI Report]  There was a large group of people exiting the nightclub because it had just closed. [Id.]  Officer Ward believed there was a fight in the crowd and fired "several rounds" from his pepper ball launcher to disperse the crowd. [Id.]  One of the patrons, who was hit in the head with pepper balls, protested being hit and, according to Officer Ward, was walking towards another officer with his fists clenched, which the individual denies. [Id.]  Officer Ward shot the individual in the head

with "several" pepper balls and then arrested him for disorderly conduct and possession of marijuana. [Id.] This incident was reviewed by EPD supervisor personnel and was cleared that the use of force was "within the policy guidelines" and "training and proper tactics were followed." [Id.] Again, Officer Ward was exonerated.

On March 7, 2010, Officer Ward responded to a report of a group of twenty (20) females that were in a parking lot at 1007 S. Kentucky Ave., Evansville, Indiana. [Plaintiff's Exhibit BB - Incident Report – March 7, 2010] According to the report, the females were shouting at each other and, in Officer Ward's opinion, preparing to fight. [Id.] He fired pepper spray at the entire crowd. [Id.] One of the people sprayed, while driving away, shouted obscenities at Officer Ward in protest of his actions, and he arrested her. [Id.]

In each and every incident listed, Officer Ward was not investigated, exonerated or otherwise cleared of his use of pepper spray and the subsequent arrests. In fact, Chief Hill and by extension, the City of Evansville, fully condones this behavior, use of force and arrests associated therewith. At the time of the event, Brad Hill was the police chief and ultimate decision maker for the EPD on policy and discipline. [Exhibit H - Hill Dep. pg.13] In this case, Hill found that the officers did not violate any of the EPD policies[6]. [Id. at pgs. 13, 51-52] In Chief Hill's evaluation of the incident he did not believe a single portion of Redd's statements which conflicted with the officer's testimony. [Id. at pg. 114] Even though, Chief Hill is not aware of "a specific thing that (Redd) did wrong" prior to being pepper sprayed, he still found no

_____

[6] Unlike when EPD officers are investigating a crime and diligently searching for the truth from all the potential criminals, the EPD, when investigating a potential claim against one of their own officers, will give the officers all of the witnesses' statements before taking the officer's statement. [Exhibit H - Hill Dep. pg. 76] Also, the EPD gives their investigated officers the rules they are alleged to have violated before taking their statement. [Id. pg. 77] In other words, the officers are given the answers to the test before they take it or even as they are being interviewed. For example, during the investigation into the Citizen's Complaint of excessive force against Officer Ward for repeatedly shooting a bystander in the head with pepper balls on November 1, 2009, another officer at the scene, Mike Evans, was interviewed by Sargent Doan. During the interview, the following exchange took place: Doan – "Q: Alright, I know that you can't really, you don't really know what was going through Ward's mind, but do you think he was shooting to defend you? Is that what you think?" Officer Evans – "A: Yeah, I mean, it, it was as soon, as soon as he, he turned toward me and as soon as he, he took the lunging, the lunging motion forward that, that I believe drew his attention and." [Exhibit II – IA Report at pg. 16]

violations of EPD policy and approved the general use of pepper spray on the crowd.  [Id. at pgs. 21, 58-59]

In a draft statement for the press containing his editorial thoughts, Chief Hill's wrote - "The officers chose to utilize a department approved, less than lethal force option that is effective at dispersing crowds – pepper spray." [Exhibit H - Hill Dep. pg.108; Exhibit M – Hill Press Statement at CE 1484]  He also admitted that the "first arriving officers [could] have stood by on arrival and waited for additional officers, before taking action," and said "Could we have done some things differently? Yes."   [Id.]   "The officers could have used a PA system on their vehicles to better disperse the crowd."  [Id at 1485] "The officers could have given orders with a specific time line for compliance."  [Id.]  "The officers made a tactical mistake by separating, which resulted in one officer being pepper sprayed." [Id.] "As a result, we will be providing our officers with more training on crowd control techniques."  [Id.] "There were people who were affected by the pepper spray who were just in the wrong place at the wrong time."  [Id.]  Chief Hill acknowledged that they have "dealt with this type of situation" of dispersing crowds several times in the past and then concluded "I ruled that these officers are exonerated from the complaint of excessive force and I support them in their actions."  [Id. at 1486.]

Based on the above, Redd has presented sufficient evidence of flawed written policies, a well settled and widespread practice and the final decision-makers callous indifference to these constitutional rights violations that *Monell* liability should be applied to the City of Evansville.

**v.**       **State Law Claims - Battery**

Redd's common law claims for false arrest, false imprisonment and excessive use of force have been previously addressed in his Response – see sections B ii-iii and the arguments contained therein.

Under Indiana common law, the civil tort of battery is defined as "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Mullins v. Parkview Hosp., Inc.,* 865 N.E. 2d 608, 610 (Ind. 2007) quoting *Restatement (Second) of Torts* § 13 (1965). Here, Redd was battered when Officer Ward intentionally sprayed Redd and the other bystanders with pepper spray and when the officers physically laid their hands and knee/foot on Redd.

## IV.    CONCLUSION

In sum, Defendants' motion for summary judgment must be denied because Plaintiff has presented sufficient evidence and pertinent legal authorities to demonstrate that genuine issues of material fact are present in the instant lawsuit. As such, Defendants are not entitled to judgment as a matter of law and grant of summary judgment is precluded. For the foregoing reasons, Redd respectfully requests that Defendants' Motion for Summary Judgment be denied.

Respectfully submitted,

s/ Kyle F. Biesecker
Kyle F. Biesecker, Attorney No. 24095-49
B. Michael Macer, Attorney No.
BIESECKER, DUTKANYCH & MACER, LLC
411 Main St.
Evansville, IN 47708
Telephone:  (812) 424-1002
Facsimile:   (812) 424-1005
Email: kfb@bdlegal.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2014, a copy of the foregoing *Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment* was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system. Parties may access this filing through the court's system.

For Defendants:

Reed S. Schmitt
RHINE ERNEST, LLP
rschmitt@rhine-ernest.com

Theodore C. Ziemer IV
RHINE ERNEST LLP
tziemer@rhine-ernest.com

s/Kyle F. Biesecker
Kyle F. Biesecker